E-FILED
Thursday, 25 August, 2016  11:40:00 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

DAVID M. GILL, DAWN MOZINGO,　)
DEBRA KUNKEL, LINDA R.　)
GREEN, DON NECESSARY, and　)
GREG PARSONS,　)
　)
　　Plaintiffs,　)
　)
　　v.　)　No. 16-cv-03221
　)
CHARLES W. SCHOLZ, sued in his )
official capacities as the　)
Chairman of the Illinois State　)
Board of Elections and of the　)
State Officers Electors Board;　)
ERNEST L. GOWEN, sued in his　)
official capacities as Vice-　)
Chairman of the Illinois State　)
Board of Elections and of the　)
State Officers Electors Board;　)
BETTY J. COFFRIN, CASSANDRA )
B. WATSON, WILLIAM M.　)
McGUFFAGE, JOHN R. KEITH,　)
ANDREW K. CARRUTHERS,　)
WILLIAM J. CADIGAN, sued in　)
their official capacities as　)
Members of the Illinois State　)
Board of Elections and Members )
of the State Officers Electoral　)
Board; and STEVE SANDVOSS,　)
sued in his official capacity as the )
Executive Director, Illinois State　)
Board of Elections,　)
　)
　　Defendants.　)

**OPINION**

**SUE E. MYERSCOUGH, U.S. District Judge.**

On August 1, 2016, David Gill, an independent candidate for
U.S. Representative in the 13th Congressional District of Illinois,
and Dawn Mozingo, Debra Kunkel, Linda R. Green, Don Necessary
and Greg Parsons, duly registered voters in the 13th Congressional
District, filed a Complaint for Declaratory Judgment and
Preliminary and Permanent Injunction (d/e 1) against members of
the Illinois State Board of Elections and the State Officers Electoral
Board in their official capacity.  Plaintiffs allege that several
provisions of the Election Code violate the First and Fourteenth
Amendments to the U.S. Constitution.  Specifically, Plaintiffs
challenge: (1) the notarization requirement; (2) the 5% minimum
signature requirement, as applied, in light of the fact that the
district is rural and geographically large; (3) the 5% minimum
signature requirement, as compared to the signature requirements
for other candidates; and (4) the cumulative effect of the 5%
minimum signature requirement, the 90-day signature gathering
period, and the splitting of population centers in the large, rural
district.

On August 18, 2016, Plaintiffs filed their Motion for Temporary Restraining Order or Preliminary Injunction (d/e 4). The Court set an expedited briefing schedule and held an evidentiary hearing on August 24, 2016. The Court now GRANTS Plaintiffs' Motion for Preliminary Injunction.

## I. BACKGROUND

On June 27, 2016, Gill filed with the Illinois State Board of Elections a Statement of Candidacy as an independent candidate for U.S. Representative. The Statement of Candidacy was accompanied by a nominating petition containing the signatures and addresses of 11,348 persons representing themselves to be registered voters within Illinois's 13th Congressional District. Gill contends that he began collecting signatures on the very first day allowed by law. He and 18 other circulators collected the 11,348 signatures.

On July 5, 2016, Jerrold Stocks of Mt. Zion filed an Objector's Petition against Gill's petition alleging, in part, that Gill did not have a sufficient number of valid signatures. On July 22, 2016, David Herman, the hearing examiner for the State Officers Electoral Board, issued his recommendation, finding that a record

examination concluded Gill had 8,593 valid signatures.  Because
that number was less than the statutorily required number of
10,754, Herman recommended that Gill's name not appear on the
General Election ballot.

The State Officers Electoral Board has scheduled a hearing for
August 26, 2016 to act on Herman's recommendation.  August 26,
2016 is also the last day for the State Board of Elections to certify
the names of the candidates for the General Election ballot to the
county clerks.  10 ILCS 5/7-60; 10 ILCS 5/10-14.

Pursuant to the Illinois Election Code, Gill, as an independent
candidate, was required to file nomination papers signed by
qualified voters of the district equaling not less than 5% nor more
than 8% of the number of persons who voted in the preceding
regular election in such district.  10 ILCS 5/10-3 (but not to exceed
the lesser of 1% of the voters who voted in the preceding Statewide
general election or 25,000).  According to the 2016 Candidates
Guide, an independent candidate for the 13th Congressional
District for the 2016 election needed 10,754 valid signatures.  See
State of Illinois Candidate's Guide 2016, http:/www.elections.il.gov
(last visited August 25, 2016).  In redistricting years, an

independent candidate need only obtain 5,000 signatures. 10 ILCS 5/10-3.

The signatures cannot be gathered more than 90 days before the last day for the filing of petitions.  10 ILCS 5/10-4.  In addition, the circulator of the petition must certify that the signatures on each sheet of the petition were signed in his presence, were genuine, and, to the best of his knowledge, were signed by registered voters in the district.  The certification must be sworn before a notary (the "notarization requirement").  See 10 ILCS 5/10-4.  Nomination papers that are "in apparent conformity with the provisions of this Act" are deemed to be valid unless an objection is made.  10 ILCS 5/10-8.

In contrast, an established party candidate—which is a party that polled more than 5% of the entire vote cast in the State in the last general election—running for U.S. Representative only needed to obtain signatures from qualified primary electors "equal to 0.5% of the qualified primary electors of his or her party in his or her congressional district."   10 ILCS 5/7-10(b).  According to the 2016 Candidates Guide, the Republican candidate for U.S. Representative in the 13th Congressional District had to obtain 739

signatures and the Democratic candidate had to obtain 733 signatures to appear on the primary ballot. The established party candidate had to collect the signatures in a 90-day period and comply with the notarization requirement. 10 ILCS 5/7-10.

## II. LEGAL STANDARD

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." <u>Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.</u>, 549 F.3d 1079, 1085 (7th Cir. 2008) (citations and quotations omitted). A party seeking to obtain a preliminary injunction must demonstrate: (1) a reasonable likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) he will suffer irreparable harm if the injunction is not granted. <u>See</u> <u>Planned Parenthood of Ind., Inc., v. Comm'r of Ind. State Dept. of Health</u>, 699 F.3d 962, 972 (7th Cir. 2012); <u>Girl Scouts</u>, 549 F.3d at 1096 (likelihood of success on the merits means a "better than negligible chance" on at least one of the claims and is an "admittedly low requirement").

If these threshold conditions are met, the district court then weighs the balance of the harm to the parties if the injunction is

granted or denied.  <u>Planned Parenthood</u>, 699 F.3d at 972.  That is, the court must consider the irreparable harm to the plaintiff if the preliminary injunction is wrongfully denied versus the irreparable harm to the defendant if the preliminary injunction is wrongfully granted.  <u>Turnell v. CentiMark Corp.</u>, 796 F.3d 656, 662 (7th Cir. 2015).  Finally, the Court must consider the public interest (non-parties) in denying or granting the injunction.  <u>Planned Parenthood</u>, 699 F.3d at 972.

The likelihood of success on the merits affects the balance of the harms analysis.  That is, the more likely a plaintiff will win on the merits, the less the balance of irreparable harm needs to favor the plaintiff's position.  <u>Planned Parenthood</u>, 699 F.3d at 972; <u>see also</u> <u>Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.</u>, 549 F.3d 1079, 1100 (7th Cir. 2008).  This balancing test requires that the court "exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'"  <u>Girl Scouts of Manitou</u>, 549 F.3d at 1086 (quoting <u>Lawson Prods., Inc. v. Avnet, Inc.</u>, 782 F.2d 1429, 1436 (7th Cir. 1986)).  Whether to grant a preliminary injunction is within the court's discretion.  <u>Ashcroft v.</u>

ACLU, 542 U.S. 656, 664 (2004) (noting that the Supreme Court and appellate courts review preliminary injunctions for an abuse of discretion); but see Turnell, 796 F.3d at 662 (noting that a "district court may abuse its discretion by making a clear factual error or a mistake of law").

### III. ANALYSIS

Plaintiffs seek a preliminary injunction prohibiting Defendants from enforcing the challenged provisions of the Illinois Election Code against Gill.  They also ask that the Court direct Defendants to include Gill's name as an independent candidate for U.S. Representative in the 13th Congressional District on the ballot in the November general election.   Alternatively, Plaintiffs ask that, in compensation for the undue burden imposed by the challenged provisions, Defendants be required to give Gill additional time to gather petition signatures from registered voters and allow him to file the additional petition sheets without requiring notarization for each sheet.

**A.    Plaintiffs have established a likelihood of success on the merits**

Ballot access restrictions infringe citizens' rights to associate for political purposes and the rights of qualified voters to cast their votes effectively.  See Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986); Libertarian Party of Ill. v. Rednour, 108 F.3d 768, 773 (7th Cir. 1997) (the rights to cast one's vote effectively and associate for political purposes derive from the First and Fourteenth Amendments).  The Equal Protection Clause is implicated when ballot restrictions disproportionately and unjustifiably burden certain types of candidates.  Jones v. McGuffage, 921 F Supp.2d 888, 895 (N.D. Ill. 2013); but see Rednour, 108 F.3d at 776 (noting that it is comparing apples to oranges when one compares the Illinois Election Code's petitioning requirements for an established party's candidate in a primary election to the petitioning requirements for a new party candidate in the general election because an established party has shown a modicum of support by having obtained at least 5% of the vote in the prior general election and obtaining signatures of .5% of qualified voters to appear on the primary ballot).

Nonetheless, the rights to vote and associate for political purposes are not absolute.  Rednour, 108 F.3d at 773.   States have a valid and important interest in regulating elections.  Tripp v. Smart, No. 14-cv-0890, 2014 WL 4457200, at *3 (S.D. Ill. Sept. 10, 2014) (hereinafter, Tripp I) ("A fair and effective electoral process has long been recognized as a legitimate state interest"). Specifically, a state has an interest in avoiding ballot overcrowding and voter confusion, detecting and preventing voter fraud, modernizing election procedure, and avoiding confusion, deception, and frustration of the democratic process.  Id. (citing cases). Moreover, states may condition ballot access to minor-party and independent candidate upon a showing of a modicum of support. Rednour, 108 F.3d at 775.

In Anderson v. Celebrezze, 460 U.S. 780, 789 (1983), the United States Supreme Court enunciated the standard by which the constitutionality of a ballot access statute is determined. Specifically, the court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against the justification put forward by the State for imposing its

rule.  <u>Anderson</u>, 460 U.S. at 789.  In addition, the court must consider the legitimacy and strength of the State's justifications and the extent to which the State's interests make it necessary to burden the plaintiff's rights.  <u>Id.</u>

If the restrictions the plaintiff challenges are "severe," the court will apply heightened scrutiny.  See <u>Rednour</u>, 108 F.3d at 773 (finding that Illinois's 5% petitioning requirement for new political parties was not severe on its face and ultimately finding that the restriction was not unconstitutional).  That is, the State must show that the regulation is narrowly tailored and justified by a compelling interest.  <u>Stone v. Bd. of Election Comr'rs for City of Chi.</u>, 750 F.3d 678, 681 (7th Cir. 2014) (finding Chicago's mayoral ballot scheme that required nominating petitions signed by at least 12,5000 registered voters to appear on the ballot was constitutional).  When a restriction is not severe, the court need only determine whether the State "has important interests that sufficiently justify the burden" on the plaintiff's rights.  <u>Rednour</u>, 108 F.3d at 773; <u>see also</u> <u>Crawford v. Marion Cnty. Election Bd.</u>, 553 U.S. 118, 191 (2008) (there is no "litmus test for measuring the severity of a burden that a state law imposes").  The ultimate question on

severity is whether a reasonably diligent candidate could be expected to meet the requirements and gain a place on the ballot. Stone, 750 F.3d at 682 ("What is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot.") (quotations and citations omitted).

Courts must consider the restrictions on candidacy together. Nader v. Keith, 385 F.3d 729, 735 (7th Cir. 2004). This makes it difficult for courts to rely on precedent because laws vary greatly from state to state and the circumstances of each case—including the evidence presented—are different. Id.; Green Party of Ga. v. Ga., 551 F. App'x 982 (11th Cir. 2014) (unpublished) (past decisions "'do not foreclose the parties' right to present the evidence necessary to undertake the balancing approach outlined in Anderson'") (quoting Bergland v. Harris, 767 F.2d 1551, 1554 (11th Cir. 1985)).

Plaintiffs argue that the signature requirement, combined with the 90-day period for collecting signatures, the notarization requirement, and size and rural nature of the 13th Congressional

District together impose a severe burden on Plaintiffs' First and Fourteenth Amendment rights. Plaintiffs assert that, given the severe burden, Defendants must show a compelling reason for the 5% signature requirement. Plaintiffs contend Defendants cannot do so.

In support of their position, Plaintiffs presented the affidavit of Richard Winger, the publisher of Ballot Access News, a non-partisan newsletter that reports on developments in ballot access law. Winger has researched ballot access laws in all 50 states from the year 1888 to the present. Winger states that Illinois is the only state that allows candidates who file fewer than the required number of signatures to get on the ballot if no one files an objector petition against them. According to Winger, no candidate for U.S. House in Illinois has ever "overcome" a general election signature requirement of 10,754 signatures or more and only three have done so in the entire country. By "overcome," Winger means a candidate who overcame an objector's petition and appeared on the ballot. Only one candidate in Illinois has ever "overcome" a general election signature requirement of 8,593 or more in Illinois, and that was H.

Douglas Lassiter in the 15th Congressional District in 1974 (before the 90-day collection period was enacted).

Winger further states that only three other states require signatures of 10,000 or more for U.S. House Candidates to get on the general election ballot:  North Carolina, South Carolina, and Georgia.  The median number of signatures required for U.S. House candidates petitioning to get on the general election ballot in all 435 House Districts is 1,000 and the average is 3,179.  In 2016, 8,593 signatures would have gotten an independent U.S. House candidate on the ballot in 88.5% of the House Districts.

Winger also states that a reasonably diligent candidate for U.S. House could not be expected to meet a signature requirement of 10,754 and gain a place on the ballot.  He bases this on the fact that, since 1890, only three U.S. House candidates have done this.

Additionally, as evidence that a candidate can get on the ballot without any signatures at all, Plaintiffs submitted Larry (Lawrence) Jo Cohen's Statement of Candidacy.  Cohen sought to be on the primary ballot as a Democratic candidate for president in the 2016 Democrat primary.  Two objectors filed a petition asserting that Cohen did not file any signatures, but later withdrew their

objection.  Cohen appeared on the ballot despite having submitted
no signatures.  In addition, at the hearing, Plaintiffs' counsel
represented that a U.S. Representative independent candidate on
the ballot in 2010, Clarence Desmond Clemons, only submitted
1,000 signatures but that no objections were filed.

Defendants argue that these types of restrictions have been
found constitutional in the past and, therefore, do not constitute a
severe burden.  Defendants further assert that the challenged laws
are reasonable, nondiscriminatory regulations designed to protect
the integrity of the election process.

The Court recognizes that these and similar regulations have
been held constitutional in the past.  See Jenness v. Fortson, 403
U.S. 431, 442 (1971) (Georgia's requirement that an independent
candidate file a nominating petition signed by at least 5% of the
number of  registered voters within a 180-day period was
constitutional); American Party of Tex. v. White, 415 U.S. 767
(1974) (Texas law requiring signatures totaling 1% of the votes cast,
which amounted to 22,000 signatures, in 55 days was
constitutional); Storer v. Brown, 415 U.S. 724, 740 (1974)
(independent candidates for President and Vice President under

California law and noting that, standing alone, obtaining 325,000 signatures in 24 days "did not appear to be an impossible burden" but requiring further proceedings to determine whether the available pool was so diminished in size that the requirement was too great of a burden); Stone, 750 F.3d at 684 (12,500 signatures in 90 days); Nader, 385 F.3d at 736 (25,000 signature in 90 days); Tripp I, 2014 WL 4457200, at * 4 (noting the difficulty in relying on precedent but noting that the "Seventh Circuit has explained that the outer constitutional bounds of a signature requirement lie somewhere close to a 5% minimum gathered in a mere 24 days").

However, Plaintiffs have presented evidence suggesting that no independent or new party candidate has been able to meet the 5% signature requirement and such candidates have only gotten on the ballot with fewer signatures because no objections were filed. See Lee v. Keith, 463 F.3d 763, 770 (7th Cir. 2006) (noting the importance of the historical record and finding the restrictions severely burdened the plaintiff's First and Fourteenth Amendment rights based in part on the fact that, in 25 years, no independent candidate had qualified for the general election ballot). While Defendants have countered this with one instance in 2006 when a

moderate party candidate needed 13,950 signature and obtained approximately 13,000 signatures, the Court nonetheless finds that Plaintiffs have demonstrated a likelihood of success on the merits. In addition, the fact that Defendants allow individuals on the ballot with no or very few of the required signatures simply because no objections are filed calls into question Defendants' justification that the 5% signature requirement is necessary.

Considering the evidence presented in this case, the Court finds that, whether the Court applies heightened scrutiny or a rational basis inquiry, Plaintiffs have shown a likelihood of success on the merits.  See, e.g., Tripp I, 2014 WL 4457200, at *4 (finding some likelihood of success on challenge to the 5% signature requirement and notarization requirement coupled with the plaintiffs' asserted problems with a rural, redrawn district).

The Court recognizes that United States District Judge Michael J. Reagan in the Southern District of Illinois granted summary judgment in favor of the defendants on a similar challenge to the 5% signature requirement, notarization requirement, and 90-day signature collection period.  See Tripp v. Smart, No. 14-cv-0890, 2016 WL 4379876 (S.D. Ill. Aug. 17, 2016)

(Tripp II).  In that case, however, the plaintiff Illinois state
representative candidates only had to obtain approximately 2,400
signatures under the 5% requirement, and the defendants
presented evidence that other independent and minor party
candidates faced with the same restrictions were able to secure a
place on the ballot.   Id. at *6.  In contrast here, the evidence is that
independent and minor party candidates have not been able to meet
the requirements and such candidates get on the ballot only if no
objections to the nominating petitions are made or if it is a
redistricting year when only 5,000 signature are required.

**B.      Plaintiffs have demonstrated that they have no adequate
           remedy at law and will suffer irreparable harm if
           preliminary relief is not granted.**

To obtain a preliminary injunction, the movant must
"establish that it will be irreparably harmed if it does not receive
preliminary relief, and that money damages and/or an injunction
ordered at final judgment would not rectify that harm."  Abbott
Labs. V. Mead Johnson & Co, 971 F.2d 6, 16 (7th Cir. 1992).  As
stated in Roland Machinery:

> The absence of an adequate remedy at law is a
> precondition to any form of equitable relief. The
> requirement of irreparable harm is needed to take care of

the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief.

Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984).

Here, Plaintiffs will have no adequate remedy at law if Gill is not on the ballot.  Moreover, they will be irreparably harmed.  An otherwise qualified candidate suffers irreparable harm if he is wrongfully deprived of the opportunity to appear on an election ballot.  Jones, 921 F. Supp. 2d at 901.  Similarly, voters who would have voted for the candidate would also suffer irreparable harm. Jones, 921 F. Supp. 2d at 901; see also Citizens for a Better Env't v. City of Park Ridge, 567 F.2d 689, 691 (7th  Cir. 1975) (noting that "even the temporary deprivation of First Amendment rights constitutes irreparable harm in the context of a suit for an injunction").  Therefore, Plaintiffs have shown they have no adequate remedy at law and would suffer irreparable harm if preliminary relief is not granted.

**C.     The balance of the harms favors Plaintiffs.**

When balancing the harms to the parties, the Court also considers the public interest.  And, as noted above, the likelihood of success on the merits affects the balance of the harms.  Planned Parenthood, 699 F. 3d at 972.

Plaintiffs argue the impact on Defendants is negligible and that the public is not harmed because the public does not have an interest in keeping qualified candidates off the ballot.

Defendants argue that the harm to them and the public is significant because States have a strong interest in preventing voter confusion by limiting ballot access to serious candidates who can demonstrate at least some level of political viability. Defendants also argue that the federal courts should avoid unwarranted interference with state elections.

The Court agrees that the ultimately resolution of this lawsuit could result in harm in the form of impairing Illinois's election regulation scheme.  See Johnson v. Cook Cnty. Officers Electoral Bd., 680 F. Supp. 1229, 1233 (N.D. Ill. 1988) (noting that "[w[hile the ultimate resolution of this lawsuit could severely impair Illinois' election regulation scheme, the harm at issue here is that

engendered by a <u>temporary</u> injunction" which at most would require the board to put on the ballot an individual who obtained 491 valid signatures out of 500 needed) (emphasis in original).  However, this Court is only considering the preliminary relief of enjoining Defendants from imposing the challenged regulations against Gill, which would result in Gill being on the ballot.  Putting a candidate on the ballot who obtained 8,593 valid signatures for nomination constitutes a negligible injury when compared against the constitutional rights of Plaintiffs and the interests of the public.  <u>Id.</u> Allowing a candidate with 8,593 valid signatures would do minimal, if any damages, to Defendants' and the State's interest in having candidates on the ballot who have shown a modicum of support. And while the Court recognizes Defendants' interest in uniformity of the law, the harm to Defendants in this instance is negligible compared to the harm to Plaintiffs.

The Court recognizes the statement in <u>Summers v. Smart</u>, 65 F. Supp. 3d 556, 569 (N.D. Ill. 2014), that more speech and more choice for voters are highly important but that the public interest is not served when a federal court intervenes to override a valid ballot-access requirement.  <u>Id.</u> (referring to the signature requirement as a

valid requirement and further finding the public interest not served by forcing the State to waive its 25,000 signature requirement despite the Green Party's delay in filing suit).  However, in <u>Jones</u>, the court granted a preliminary injunction after finding no public interest existed in preserving a two-party ballot or excluding qualified candidates.  <u>Jones</u>, 921 F. Supp. 2d at 902 (finding the more compelling public interest was the plaintiff's expression and associational rights).  On the whole, the Court finds that the public interest heavily favors Plaintiffs.

Defendants also argue that Plaintiffs' delay in moving for a preliminary injunction cuts against granting their motion.  <u>See Nader</u>, 385 F.3d at 736 (noting "it would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season" and after absentee ballots had already been mailed); <u>Summers</u>, 65  F. Supp. 3d at 567(finding that the plaintiffs' delay in filing suit challenging certain restrictions created a situation where the only relief the court could grant would essentially waive a valid signature requirement rather than address the allegedly unconstitutional provisions of the Election Code and, therefore, the balance of harms weighed in favor of the State).  But the Court

notes that Plaintiffs filed the lawsuit ten days after the hearing
examiner recommended Gill not be placed on the ballot.  The Court
considers ten days, under the circumstances, to be a reasonable
amount of time in which to find and recruit an attorney and for the
attorney to research and prepare the complaint and the motion and
brief for a preliminary injunction.  Moreover, Defendants were on
notice as to Plaintiffs' legal challenge, and the likely time-sensitivity
relating to it, once Plaintiffs filed their complaint which also sought
preliminary relief.  The delay in filing the preliminary injunction
motion does not outweigh the strong public interest in Plaintiffs'
favor.  The Court finds that the balance of harms strongly favors
Plaintiffs.

**D.    As a remedy, the Court enjoins Defendants from enforcing
the Illinois Election Code's 5% signature requirement
against Gill.**

Having found that Plaintiffs meet the requirements for
preliminary relief, the Court must fashion an appropriate remedy.
The Court will not preliminarily remedy any issues pertaining to the
notarization requirement and the 90-day period.  Gill appears to
have satisfied the notarization requirement, and, therefore, any
preliminary relief granted would have no effect on Gill.  Summers,

65 F. Supp. 3d at 565.  In addition, extending the time to obtain additional signatures would heavily burden Defendants, who must certify the ballots by August 26, 2016 and mail ballots overseas by September 23, 2016.  Granting such relief would tip the balance of harms in favor of Defendants.  Id.

That leaves only the signature requirement.  Gill obtained 8,593 signatures.  At this stage of the litigation, the Court will not attempt to determine what an appropriate signature requirement might be, as the Court may ultimately find the challenged regulations constitutional.  However, because Plaintiffs have met the requirements for preliminary relief, the Court will enjoin Defendants from enforcing the Illinois Election Code's 5% signature requirement against Gill.  The Court finds it telling that the signature requirement for U.S. Representative independent candidates in redistricting years is 5,000, and it appears that three independent candidates managed to obtain those signatures in 2012.[1]  Gill far exceeded 5,000 valid signatures.

---

[1] Of course, it is entirely possible that those three candidates had less than 5,000 signatures and no one objected.  The parties did not provide any evidence on this.  But see Tripp II, 2016 WL 4379876, at *6 (S.D. Ill. Aug. 17, 2016) (noting that 13th Congressional District of Illinois candidate John Hartman in 2012 submitted 821 notarized sheets containing up to ten

In addition, for United States Senator, an established party candidate must obtain signatures of not less than 5,000 or more than 10,000 primary electors of his or her party  10 ILCS 5/7-10(a). Independent candidates must obtain signatures of a minimum of 1% of the number of voters who voted in the preceding statewide General election or 25,000 qualified voters of the state, whichever is less.  10 ILCS 5/10-3.  According to the 2016 Candidate Guide, an independent candidate for U.S. Senate had to obtain 25,000 signatures, or five times more than the established party candidate. Applying that same proportion here, if an independent candidate for U.S. Representative has to obtain five times more signatures than the established party candidate, he would have had to obtain 3,695 signatures (taking the 739 signatures the Republican candidate had to obtain and multiplying that number by five).  Again, Gill easily meets that requirement.

### E.    The Court finds no security is necessary at this time.

Defendants were not prepared at the hearing to address whether security would be required in this case.  See Fed.R.Civ.P.

nominating signatures per sheet, suggesting he filed more than 5,000 signatures.

65(c) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay and costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). Defendants may submit additional briefing on that issue. At this time, the Court finds that the proper amount is zero.

**IT IS HEREBY ORDERED THAT:**

(1) Plaintiffs' Motion for Preliminary Relief (d/e 4) is GRANTED.

(2) Defendants are ENJOINED from enforcing the Illinois Election Code's signature requirement against David M. Gill, independent candidate for U.S. Representative in the 13th Congressional District in light of the fact that he has obtained 8,593 valid signatures and shown a modicum of support. Consequently, because it appears Gill otherwise qualifies to be on the ballot, this ruling requires that Gill remain on the ballot.

ENTER: August 25, 2016

FOR THE COURT:

　　 s/Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE