IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD

DAVID M. GILL, et al. ,               )
                                      )
                 Plaintiffs,          )
v.                                    )      No. 16 – cv – 3221
                                      )
CHARLES W. SCHOLZ, et al.,            )      Hon. Sue E. Myerscough
                                      )
                 Defendants.          )

### Response to Defendants' Motion to Dismiss

Plaintiffs, through counsel, file their response in opposition to Defendants' motion to dismiss, and respectfully request that said motion be denied for the reasons stated herein.

### Introduction

Plaintiffs David Gill, an independent candidate for U.S. Representative in the 13th Congressional District of Illinois, and Dawn Mozingo, Debra Kunkel, Linda R. Green, Don Necessary and Greg Parsons, duly registered voters and supporters of Gill, filed their complaint for declaratory judgment and injunctive relief against the Illinois State Board of Elections ("ISBE") and its four politically affiliated members.

Defendant board members are recognized as being Democratic party and the Republican party members that have reached sufficient political "recognition" that they became eligible for appointment as members of the State Board of Elections. However, the Seventh Circuit cautioned that "…the two major parties, who between them exert virtually complete control over American government, are apt to collude…" to deny ballot access to others. *Nader v. Keith*, 385 F.3d 729 at 732 (7th Cir. 2004).

1

The Plaintiffs are among the thousands of voters that organized and gathered signatures for Gill, and wanted see the name of their candidate, Gill, on the ballot as an independent candidate. The Democratic and Republican candidates that would have competed against Gill each submitted less than 740 signatures, for the same ballot access right.

The Plaintiffs' complaint alleges that several provisions of the Election Code violate the First and Fourteenth Amendments to the U.S. Constitution. Specifically, Plaintiffs challenge: (1) the notarization requirement; (2) the 5% minimum signature requirement, as applied, in light of the fact that the district is rural and geographically large; (3) the 5% minimum signature requirement, as compared to the signature requirements for other candidates; and (4) the cumulative effect of the 5% minimum signature requirement, the 90-day signature gathering period, and the splitting of population centers in the large, rural district.

The Plaintiffs previously filed their motion for preliminary injunction, which was granted by this court on August 25, 2016. Thereafter Defendants appealed the granting of the preliminary injunction, but did not seek expedited review. Ultimately, the Seventh Circuit dismissed the appeal as moot because the November 8, 2016 election had passed. The Defendants' request to vacate the preliminary injunction order was also denied by the Seventh Circuit.

A.    **Plaintiffs' Allegation in the Complaint.**

At issue is the application of the signature requirement contained in 10 ILCS 5/10-3, which indiscriminately requires signatures of no less than 5% of the voter who voted at the previous election, but no more than 8%. See Complaint, Dkt. 1, Par. 15. The Defendants enforced a precise signature requirement of no less than

10,754 signatures for 13th District. (Dkt. 1, Par. 16.) In addition, the Defendants enforced a 90 day signature gathering time period for such signatures gathered from the largely rural 13th District spanning at least 183 miles. (Dkt. 1, Par. 17-19 and 52-57.)

Candidate, Gill, submitted 11,350 signatures of voters from the 13th District, with each sheet being separately notarized by an Illinois notary public. (Dkt. 1, Par. 21.) However, through a further barrier to ballot access, the Defendants undertook a records examination which in the abstract (and in total disregard for the notarization upon each page), compared a signature signed upon a clipboard with a signature from a voter registration card. (Dkt. 1, Par. 24.)

The Defendants, through their fast-paced review determined that ultimately, Plaintiff Gill's nomination papers contained only 8,593 signatures. (Dkt. 1, Par. 24.) However, the number of signatures (or "modicum of support") that U.S. House candidates in Illinois' 13th Congressional District must obtain varies wildly under the Illinois Election Code.

A candidate whose petitions are not objected to, need not obtain any signatures other than his/her own and will be certified by the Defendants to the ballot. (Dkt.1, Par. 22). In 2016 both major party candidates needed fewer than 740 signatures to appear on the ballot. (Dkt. 1, Exh. A, and Par. 61.) In redistricting years (2012 or 2022) an independent candidate requires 5,000 signatures. 10 ILCS 5/10-3. However, in 2016 an independent candidate in the 13th District had to obtain 10,754 signatures in a circulation period limited to 90 days, after review by the Defendants. (Dkt. 1, Par. 61.)

3

The severe burden that the 5% signature requirement placed upon candidates was discussed in Counts II and III of the Complaint, which allegations are presumed true for purposes of a motion to dismiss.

Of import are the facts alleged in Paragraphs 75-82 of the Complaint which are taken as true for purposes of a motion to dismiss:

> 75.   No candidate for U.S. House in Illinois has ever overcome a general election signature requirement of 10,754 or ore, and since 1890 only three (3) have done so  in the entire country.

> 77.   Only one candidate for the U.S. House has ever overcome a general election signature requirement of 8,593 or more in Illinois, and that was H. Douglas Lassiter in the 15th Congressional District in 1974.

> 78.  Since 1890 in the U.S. only 12 candidates for the U.S House have overcome a general election ballot signature requirement of 8,593 or more.

> 79.  There have been more than 25,000 U.S. House races since 1890.

> 80.   Thus, in only 0.048% of U.S. House races since 1890 has a candidate overcome a general election signature requirement of 8593 or more (number of valid signatures Plaintiff candidate [was deemed to have] filed in this case).

> 81.   Thus, in only 0.012% of all U.S. House races since 1890 has a candidate overcome a general election ballot signature requirement of 10,754 or more (number of signatures Plaintiff Candidate was required to file instantly, pursuant to the Election Code).

> 82.   The foregoing facts describe the State's severe and overly burdensome restrictions on ballot access, which result in a violation of the Plaintiffs' constitutional rights.

Also of significance is the 90 day restriction that was implemented by the Illinois General Assembly in 1984, which did not exist previously. The 13th District is described in the Complaint as well, in paragraphs 52-58. (Dkt. 1, Par. 52-58.)

B.    **Constitutional Rights at Stake.**

The U.S. Supreme Court declared in *Reynolds v. Sims* that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362 (1964). Thereafter, dozens of decisions from the U.S. Supreme Court have struck down ballot restrictions that were overly burdensome.

The Supreme Court in *Storer v. Brown*, 415 US 724 (1974) first outlawed the "litmus-paper test" and established the test that if a reasonably diligent candidate could not overcome the requirement, then such a requirement was unconstitutional.  In *Storer* the court did not have sufficient facts to determine that test, so remanded to CA Dist. Court.  Three years later the Supreme Court held the same in *Mandel v. Bradley*, 432 U.S. 173 (1977), but did not have sufficient facts to make a determination, so remanded to district court.

In 1983, the Supreme Court reiterated reviewed the fundamental constitutional rights that were implicated by overly burdensome eligibility requirements, explained as follows:

> The impact of candidate eligibility requirements on voters implicates basic constitutional rights.[7] Writing for a unanimous Court in *NAACP v. Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958), Justice Harlan stated that it "is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the `liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." In our first review of Ohio's electoral scheme, *Williams v. Rhodes*, 393 U. S. 23, 30-31 (1968), this Court explained the interwoven strands of "liberty" affected by ballot access restrictions:
>
>> "In the present situation the state laws place burdens on two different, although overlapping, kinds of rights — the right of

individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms."

As we have repeatedly recognized, voters can assert their preferences only through candidates or parties or both. "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish*, 415 U. S. 709, 716 (1974). The right to vote is "heavily burdened" if that vote may be cast only for major-party candidates at a time when other parties or other candidates are "clamoring for a place on the ballot." *Ibid.*; *Williams v. Rhodes*, supra, at 31. The exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens.

*Anderson v. Celebrezze*, 460 U.S. 780, 786-788 (1983).

The *Anderson* court, citing to *Storer*, went on to explain the district court's

process of evaluating challenged litigation as follows:

Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer*, supra, at 730. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. See *Williams v. Rhodes*, supra, at 30-31; *Bullock v. Carter*, 405 U. S., at 142-143; *American Party of Texas v. White*, 415 U. S. 767, 780-781 (1974); *Illinois Elections Bd. v. Socialist Workers Party*, 440 U. S. 173, 183 (1979). The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made." *Storer v. Brown*, supra, at 730.[10]

*Anderson v. Celebrezze*, 460 U.S. 780, 789-790 (1983).

Similarly, the Seventh Circuit in *Stone v. Bd. of Elec. Comr'rs for City of Chicago*, explained that a factor to determine whether a restriction on ballot access is severe is whether a reasonably diligent candidate could be expected to meet the requirements and gain a place on the ballot. *Stone*, 750 F.3d 681, 682 (7th Cir. 2014).

Other than the affidavit of Richard Winger submitted in support of Plaintiff's motion for preliminary injunction (consistent with allegations in the Complaint (Dkt. 1, Par. 75-82), and all facts presumed to be true in the Complaint, Defendants have not previously presented facts either in opposition to Plaintiffs' motion for preliminary injunction, or thereafter, that contradict the allegations in the Complaint.

C.   <u>Standard of Review for Rule 12(b)(6) Motion.</u>

The Seventh Circuit has explained the standard for review of a Rule 12(b)(6) motion as follows:

> We review a district court's decision to grant a motion to dismiss under Rule 12(b)(6) *de novo*, accepting the well-pleaded allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir.1996). A dismissal under Rule 12(b)(6) is proper only where the plaintiff can prove no set of facts that would entitle him to relief. *Id.* at 1429-30.

*Porter v. DiBlasio,* 93 F.3d 301, 305 (7th Cir.1996).

Overall, a court's "primary concern is with the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.' Therefore, '[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'" *Anderson*, 460 U.S. at 786. (Internal citation omitted.)

"Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views. . . . Consistent with this tradition, the Court has recognized that the First Amendment protects 'the freedom to join together in furtherance of common political beliefs.'" *California Democratic Party v. Jones*, 530 U.S. 567, 574, 120 S. Ct. 2402 (2000), citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-215, 107 S. Ct. 544 (1986). See also *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S. Ct. 533 (1986), and *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S. Ct. 5, 10 (1968).

If the burden on the Plaintiffs' constitutional rights is severe, the state regulation must be **narrowly** drawn to advance a **compelling** state interest to be constitutional (i.e., strict scrutiny). *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (emphasis added).

**D.    Notarization Requirement Imposes Severe Burdens Upon Circulators in the Largely Rural 13th District.**

Defendants' motion does not dispute any of the allegations in the Plaintiffs' complaint, which are taken as true for purposes of the motion to dismiss. Rather, Defendants argue purported factual arguments, in a vacuum, without support or reference to the allegations in the Complaint. In addition, Defendants completely misconstrue the case law when they argue that notarization will somehow "prevent fraud" when in actuality, it is the circulator's affidavit, that has been referenced as preventing fraud.

As such, Defendants' arguments about fraud prevention fail, because Plaintiffs are not arguing for the removal of the circulator's affidavit, but rather,

8

that the State has no rational basis for the higher "notary" standard rather than swearing to each circulator's affidavit pursuant to 735 ILCS 5/1-109. (Dkt. 1, Par. 31-33.)

Notarization requirement has been struck down recently, in the matter *Green Party of Pennsylvania v. Aichele*, 89 F.Supp.3d 723 (E.D. Penn. 2015).  In *Aichle*, the Commonwealth similarly argued that notarization served a fraud prevention purpose through their motion for summary judgment. *Id.* The reaching its holding, the court in *Aichle* considered that:

> In *Lubin*, the Supreme Court held that the state's interest in limiting ballot access "must be achieved by a means that does not unfairly or unnecessarily burden a minority party's . . . equally important interest in the continued availability of political opportunity." *Lubin*, 415 U.S. at 716, 94 S.Ct. 1315.

*Id.* at 744. Both "minor parties" and "independent" candidates in Illinois are governed by the same provisions of the Election Code, Article 10, and 10 ILCS 5/10-3 applies equally to both. See also,  *Perez-Guzman v. Gracia,* 346 F.3d 229 (1st Cir.2003) (struck down notarization requirement as unduly burdensome).

Plaintiffs' Complaint alleges that the task of obtaining a notary stamp upon each page of the nomination papers imposes a severe burden upon Plaintiff Gill's ability to collect in excess of 10,754 signatures within the 90 signature gathering time.  See generally, Complaint, Count I. (Dkt. 1.)

The complaint recites facts regarding the burdens of notarization, that create a factual inquiry, regarding the specific delay that notarization imposed on the circulators, rather than signing under penalties of perjury such as permitted under the Illinois Code of Civil Procedure, 735 ILCS 5/1-109 or the equivalent "declaration" under the federal rules (see e.g., 28 U.S. Code § 1746 and FRCP 56).

The Defendants' motion to dismiss at page 6 claims that sheets that are notarized are easier to prosecute fraud than with the Code of Civil Procedure certification. However, no explanation is given, since both signatures (whether under 1-109 or before a notary) are under penalties of perjury. Furthermore, the Defendants do not have standing to prosecute criminal fraud, since the authority of the Defendants is limited to only those powers granted under the Election Code, and criminal enforcement is not within the Defendants' powers. *Kozenczak v. Du Page County Officers Electoral Bd.,* 299 Ill.App.3d 205, 700 N.E.2d 1073 (1998)

Nonetheless, criminal enforcement would not be deterred by signing under penalty of perjury, or is stronger, since the notary public would not be called as an additional witness.

Plaintiff Gill had to take time to have numerous sheets notarized. If Gill's circulators had not had to spend so much time (and expending funds) getting notarizations, they would have been able to get more signatures. Ultimately, this is a question of fact, that is not capable of being resolved on motion to dismiss.

Under the analysis articulated above, the question regarding burdens that the notarization requirement placed upon Plaintiff Gill, and how many more signatures he would have achieved without having to find a notary public, remains a question of fact. The presumption under a motion to dismiss would be that Plaintiffs have articulated an overly burdensome requirement.

**E.**     **Signature Requirement for the 13th District is Unduly Burdensome, as Demonstrated by the Inability of More Candidates to Attain Ballot Access.**

As explained above, the analysis of whether a signature requirement in a particular case is constitutional or not, depends upon the facts specifically

10

presented in each such case. There is no "litmus-test" that says whether a certain signature percentage or number is valid across the board.

If the burden on constitutional rights is severe, the state regulation must be narrowly drawn to advance a compelling state interest to be constitutional (i.e., strict scrutiny). *Burdick v. Takushi,* 504 U.S. 428, 434 (1992). The regulation, as alleged in the Complaint, imposes too harsh of burden upon Plaintiff Gill, as compared to the geography, density, distance, and notarization.

One factor to consider is whether reasonably diligent candidates are able to overcome the signature requirement, and attain ballot access status. The Plaintiffs' complaint alleges at Par. 75-82 (Dkt. 1, Par. 75-82), that very few candidates have ever in the nation's history achieved what the election code in Illinois requires of candidates for US House from Illinois. Similarly, the Complaint further alleges the additional considerations that the 13th District is largely rural, and spread out over 183 miles in length.

The 13th District is very different from Chicago which is densely populated and does not require very much travel to obtain signatures. The Seventh Circuit explained that:

> What is ultimately important is not the absolute or relative number of signatures required but whether a "reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Bowe v Bd. of Election Comm'rs of City of Chicago,* 614 F.2d 1147, 1163 (7th Cir. 1980) (citing *Storer,* 415 U.S. at 742).

*Stone v Bd. of Elections Comm'rs of City of Chicago*, 750 F. 3d 678,682 (7th Cir. 2014).

Plaintiffs' complaint alleges sufficient facts that support the Plaintiffs' argument that 10 ILCS 5/10-3 imposes an unconstitutional burden, which is not

narrowly tailored, to achieve a legitimate State interest, particularly when the established party candidates require fewer than 740 signatures.

Defendants cite to *Jenness* as upholding a 5% signature requirement, however, that decision is based specifically upon the facts presented, which did not include the factual hurdles that have faced Plaintiffs herein, including a 90 day signature gathering time period. Defendants also cite to *Norman v. Reed* for a 2% signature requirement in densely populated suburban Cook County, though again, each case turns upon the facts that are presented.  Similarly Defendants string cite to many cases at page 10 of their motion to dismiss for a 5% standard, however, each turns on specific facts, because there is no "litmus test."

**F.**    **Cumulative Effect is Consistent With Supreme Court Analysis.**

The Supreme Court, as articulated in many decision, has thrown out the old "litmus paper" test, in favor of a fact based inquiry. The cumulative effect of the notarization requirement, whether it is 10 minutes or 45 minutes per notarization, the large rural district, the disproportionately high signature requirement (far greater percentage than needed to maintain an orderly ballot), all hindered the Plaintiffs for the reasons stated in the complaint and above.

Therefore, the burden is magnified when all obstacles are considered together. For example, in *Lee v. Keith*, 463 F. 3d 763 (7th Cir. 2006), the court struck down state legislative requirements because not a single legislative candidate could overcome the ballot access hurdles. The facts are similarly alleged in the Plaintiffs' complaint – that not a single candidate has been able to achieve the ballot within a 90 day circulation period.

The allegations in the complaint are powerful. If the ballot access laws were fair and narrowly drawn to advance a compelling state interest, then the Defendants should have been able to argue those compelling state interests. However, the facts that the law prevents most all candidates from achieving the ballot, is strong evidence of overbearing, and unnecessarily restrictive legislation.

WHEREFORE, Plaintiffs, through counsel, respectfully request that factual inquiries be addressed appropriately through summary judgment or trial, and that the Defendants' motion to dismiss be denied.

Respectfully submitted,
By:    s/ Andrew Finko
Attorney for Plaintiffs-Appellees

ANDREW FINKO
Attorney at Law
180 West Washington, Suite 400
Chicago IL 60602
(773) 480-0616
finkolaw@fastmail.fm

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 21, 2017, that he electronically filed the foregoing with the Clerk of the Court of Appeals for the Seventh Circuit using the CM/ECF system, which will send notification of such filing to all parties and counsel of record who are ECF filers.

s/  Andrew Finko