E-FILED
Tuesday, 18 December, 2018  04:17:10 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **DAVID M. GILL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 16-cv-3221** |
| | ) | |
| **CHARLES W. SCHOLZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

On August 1, 2016, Plaintiffs filed a Complaint (#1) alleging that various provisions of Illinois' ballot access laws violate the U.S. Constitution's First and Fourteenth Amendments. Plaintiffs filed an (Amended Corrected) Motion for Summary Judgment and Memorandum of Law (#41) on July 26, 2018, after filing a Statement of Undisputed Material Facts (#38) on July 20, 2018. Defendants filed a Combined Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment (#42) on August 20, 2018. Plaintiffs filed a Combined Response and Reply Brief to Cross Motions for Summary Judgment (#45) on October 1, 2018.  Defendants filed a Reply Memorandum in Support of Their Motion for Summary Judgment (#46) on October 26, 2018.

The parties' cross-motions for summary judgment are now ready for ruling. For the reasons that follow, Plaintiffs' Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED.

I. FACTS

A. <u>The Parties</u>

Plaintiff David M. Gill sought to appear on the November 8, 2016, Illinois general election ballot as an independent candidate for the 13th Congressional District of Illinois' Representative in the United States House of Representatives. He is a resident of Bloomington in McLean County, Illinois. The other Plaintiffs, Dawn Mozingo, Debra Kunkel, Linda R. Green, Don Necessary, and Greg Parsons, are all registered voters in the 13th Congressional District who circulated or signed Gill's petition to be included on the general election ballot and wished to vote for Gill in the general election.

The 13th Congressional District ("the District") comprises over 5,793 square miles and is largely rural. Illinois' 15th, 16th, 17th and 18th Congressional Districts are larger, ranging from 6,933 to 14,695 square miles. Parts of, but not all of, three major cities (Springfield, Bloomington, and Normal) are within the District, which also contains Champaign-Urbana and the St. Louis Metro-East area. The District boundaries do not entirely align with county boundaries, resulting in five counties being split between the District and other Congressional Districts.

Plaintiffs name as Defendants all of the appointed members of the Illinois State Board of Elections ("ISBE"), in their official capacities: Charles W. Scholz, Ernest L. Gowen, Betty J. Kuffrin, Cassandra B. Watson, William M. McGuffage, John R. Keith, Andrew K. Carruthers, and William J. Cadigan. Together, these Defendants constitute the Illinois State Board of Elections. They also constitute the State Officers Electoral Board ("SOEB"), the body that hears and passes upon objections to the nominations of

2

candidates for State and Congressional offices of Districts situated in more than one

county, including the District. Plaintiffs also sue the Executive Director of ISBE, Steve

Sandvoss, in his official capacity.

B. The Illinois Election Code

The Illinois Election Code governs the nomination of independent candidates,

stating:

> Nominations of independent candidates for public office within any
> district or political subdivision less than the State, may be made by
> nomination papers signed in the aggregate for each candidate by qualified
> voters of such district, or political subdivision, equaling not less than 5%,
> nor more than 8% (or 50 more than of the minimum, whichever is greater)
> of the number of persons, who voted at the next preceding regular
> election in such district or political subdivision in which such district or
> political subdivision voted as a unit for the election of officers to serve its
> respective territorial area.

10 Ill. Comp. Stat. 5/10-3.

The parties agree that under this provision (the "5% signature requirement"), 5%

"of the number of persons voting at the next preceding regular election" in the District

amounted to 10,754 persons for the 2016 election. Gill therefore needed at least 10,754

signatures to be on the 2016 general election ballot as an independent candidate for the

District.

The Election Code provides a different procedure for candidates from

established parties. For individuals seeking to run as established party candidates,

primary elections precede the general election. In order to be on the primary ballot for a

United States Congressional office, a party member must obtain signatures from "0.5% of the qualified primary electors of his or her party in his or her congressional district." To be on the general election ballot, the party member must win his or her primary election.

The Illinois Election Code requires all signatures on nomination papers be obtained within 90 days of the last day for filing the nomination petition ("90-day petitioning window"). 10 Ill. Comp. Stat. 5/10-4. This 90-day petitioning window applies to established parties' potential candidates as well as independent and new parties' potential candidates. Gill's 90-day signature collection period began March 29, 2016, and ended June 27, 2016.

The Election Code further requires that each individual petition signature sheet contain a notarized affidavit ("notarization requirement"). 10 Ill. Comp. Stat. 5/10-4. In the affidavit, the person who obtained the signatures ("circulator") must indicate on each sheet either the dates on which he or she circulated that sheet (or the first and last dates on which the sheet was circulated), or certify that none of the signatures on the sheet were signed more than 90 days before the last day for the filing of the petition. The circulator must also certify that each signature on that sheet was signed in the circulator's presence, is genuine, and, to the best of the circulator's knowledge and belief, is from a "duly registered voter[ ]" of the relevant district. The notarization requirement applies to established party, independent, and new party candidates.

4

C. <u>Gill's Nomination Petition</u>

On June 27, 2016, Gill timely petitioned to be an independent candidate for the District. He filed signatures and addresses of approximately 11,350 petition signers who represented themselves as qualified in-district voters. Gill had personally collected nearly 5,000 signatures. A team of 18 other petition circulators collected the rest.

At the time Gill filed his nomination papers, the ISBE considered timely-filed nomination papers valid unless an objection was filed within five business days of the last day for filing the nomination papers. On July 5, 2016, Jerrold Stocks filed a timely objection to Gill's nomination.

The ISBE conducted a records examination, and the SOEB determined that only 8,593[1] of the signatures submitted by Gill were valid signatures of registered, in-district voters. A hearing examiner revised that number down to 8,491 after further review.

Because Gill did not have 10,754 valid signatures, the SOEB sustained the objection to Gill's nomination and issued its decision that Gill's name would not be printed on the ballot.

---

[1]The parties both discuss this number's relationship to the number of signatures collected by candidates in other races. Plaintiffs make much of the fact that only one candidate in an Illinois race has ever collected more signatures than Gill: Douglass Lassiter. In 1974, Lassiter became a candidate for Illinois' 15th Congressional District after collecting 9,698 signatures. Defendants point out that a small number of Congressional candidates in other states have collected more signatures than Gill. Plaintiffs note that Lassiter and all of the candidates pointed to by Defendants had, or at least may have had, more than 90 days in which to collect signatures.

5

On August 1, 2016, Plaintiffs responded by filing the four-count Complaint (#1) in this case, challenging the constitutionality of Illinois' ballot access requirements for independent candidates. Subsequently, upon the close of discovery, the parties filed the cross-motions for summary judgment at issue in this order.

## II. ANALYSIS

### A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Singer*, 593 F.3d at 533, quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

When cross motions for summary judgment have been filed, this court must review the record construing all inferences in favor of the party against whom the motion under consideration is made. See *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 818 (7th Cir. 2008).

B. The Parties' Cross-Motions for Summary Judgment

Plaintiffs' Complaint (#1) contains four counts. Both parties argue that they are entitled to summary judgment on all counts.

Count I challenges the constitutionality of the notarization requirement. In Count I, Plaintiffs allege that the notarization requirement violates the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to the District. They allege that the lesser restriction of certification under 735 Ill. Comp. Stat. 5/1-109 would serve the same purpose as the notarization requirement, and that the notarization requirement adds an extra step that requires additional time and effort that could be spent collecting signatures. They further allege the notarization requirement disproportionately impacts candidates outside of established political parties who need more signatures than established party candidates.

Counts II and III challenge the constitutionality of the 5% signature requirement. In those Counts, Plaintiffs allege that the 5% signature requirement violates the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to the District. They allege that, in the rural, geographically large District whose boundaries split some counties and some of the few population centers in the District, the 5% signature requirement places an unduly severe burden on their constitutional right to ballot access. They further allege that the 5% signature requirement is unconstitutional because established party candidates face a much lower numerical signature requirement, that a more modest signature requirement in line with other

7

jurisdictions would be more appropriate, and that no candidate for the U.S. House in Illinois has ever collected 10,754 signatures while very few candidates nationwide have ever collected more than 8,593 signatures.

Count IV challenges the constitutionality of the 5% signature requirement and the notarization requirement considered cumulatively with the 90-day petitioning window and the geographical challenges of the District, which is largely rural and contains population centers split by District boundaries after a recent redistricting.

The court finds that Defendants are entitled to summary judgment on all of Plaintiffs' claims based upon the Seventh Circuit's decision in *Tripp v. Scholz*, 872 F.3d 857 (7th Cir. 2017). Because the case is directly on point, the court will discuss and quote the *Tripp* case at length and then compare the issues in this case in the order they were discussed in *Tripp*.

1. *The Seventh Circuit's Opinion in Tripp v. Scholz*

In *Tripp v. Scholz*, Green Party members sought to appear on the general election ballot in Illinois as candidates for state representative in two districts in the 2014 General Election. *Tripp*, 872 F.3d at 859. The districts were rural and geographically large, covering 2,808 and 1,810 square miles. As a result of a recent redistricting, a population center that had been entirely within one of those districts was split between the districts. *Id.* at 861.

Under the Illinois Election Code, the Green Party was a "new" political party in those districts. As members of a new party, the Election Code required the potential candidates to meet the 5% signature requirement by obtaining nomination petition

signatures equaling 5% of the number of voters in the prior regular election for state representative in their districts. The notarization requirement and the 90-day petitioning window also applied. *Tripp*, 872 F.3d at 859-61, 871.

Because neither potential candidate collected a sufficient number of notarized signatures during the 90-day period, the ISBE ruled that neither would appear on the general election ballot. The potential candidates and some of their prospective voters then sued ISBE officials in federal court, arguing that the 5% signature requirement and the notarization requirement violated the Free Speech and Association Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, both facially and as applied to the relevant districts. They also challenged the constitutionality of the signature and notarization requirements considered cumulatively with the 90-day petitioning window and the geographical challenges of the relevant districts. *Tripp*, 872 F.3d at 861-62.

Before rejecting all of the plaintiffs' claims, the *Tripp* court discussed the relevant Constitutional framework and noted, "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights to associate politically with like-minded voters and to cast a meaningful vote." *Tripp*, 872 F.3d at 862 (internal quotations and citations omitted). The court further noted, such rights "are not absolute." Instead, these rights are balanced against the "broad authority to regulate the conduct of elections" that the Constitution confers upon the states. *Id.* at 863 (internal quotation and citation omitted).

9

The *Tripp* court then relied upon several Supreme Court cases in discussing a state's need to regulate elections. The court in *Tripp* quoted the Supreme Court's decision in *Burdick v. Takushi*, 504 U.S. 428 (1992), stating, "in addition to constitutional law, '[c]ommon sense . . . compels the conclusion that government must play an active role in structuring elections.'" *Tripp*, 872 F.3d at 863. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). "As a result, states enjoy 'considerable leeway' with respect to election procedures." *Id.* (quoting *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191 (1999)).

With these competing considerations in mind, restrictions on candidates' eligibility for the ballot are considered under a flexible standard, involving a practical assessment of the justifications for and effects of the restrictions. *Tripp*, 872 F.3d at 864. A restriction "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Id.* (internal quotations and citations omitted). "Not all restrictions . . . on candidates' eligibility for the ballot impose constitutionally-suspect burdens, and the mere fact that a State's system creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny." *Id.* at 863 (internal quotations and citations omitted).

More specifically, ballot access restrictions are evaluated under a balancing
inquiry where:

> . . . the Court "must first consider the character and magnitude of the
> asserted injury to the rights protected by the First and Fourteenth
> Amendments that the plaintiff seeks to vindicate. It then must identify
> and evaluate the precise interests put forward by the State as justifications
> for the burden imposed by its rule. In passing judgment, the Court must
> not only determine the legitimacy and strength of each of those interests;
> it also must consider the extent to which those interests make it necessary
> to burden the plaintiff's rights. Only after weighing all these factors is the
> reviewing court in a position to decide whether the challenged provision
> is unconstitutional.

*Tripp*, 872 F.3d at 864 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

As a practical matter, the first stage of that *Anderson* balancing inquiry is often
where "much of the action takes place," in that a restriction imposing a severe burden
on constitutional rights faces a much higher hurdle to pass constitutional muster than a
restriction that does not do so. *Tripp*, 872 F.3d at 864. "If the burden on the plaintiffs'
constitutional rights is severe, a state's regulation must be narrowly drawn to advance a
compelling state interest. On the other hand, if the burden is merely reasonable and
nondiscriminatory, then the government's legitimate regulatory interests will generally
carry the day." *Id.* (internal quotations and citations omitted).

### a. The 5% Signature Requirement

The *Tripp* court first examined the 5% signature requirement, standing alone, and
concluded that it does not violate the First or Fourteenth Amendment. The court
disagreed with the plaintiffs' assertion that the 5% signature requirement imposed a
severe burden on their constitutional rights. Noting multiple Supreme Court cases

11

upholding signature requirements equaling 5% of the eligible voting base, the *Tripp*

court concluded that the 5% signature requirement was not severe on its face. *Tripp*, 872

F.3d at 864-65.

The court then asked "whether a reasonably diligent candidate could be expected

to be able to meet the requirements and gain a place on the ballot," and found that the

answer was "yes." *Id.* at 865. Stating that "ballot access history is an important factor in

determining whether restrictions impermissibly burden the freedom of political

association," the court noted that third party candidates were able to meet the 5%

requirement in multiple districts across multiple elections, serving as "powerful

evidence that the burden of satisfying the 5% signature requirement is not severe." *Id.*

(internal quotations and citations omitted).

The court dismissed the plaintiffs' focus on the fact that established parties faced

a much lower numerical signature requirement. "[C]omparing the petitioning

requirements for an 'established' party's candidate in a primary election and a 'new'

party's candidate in a general election" is to "compare apples with oranges." *Tripp*, 872

F.3d at 865 (quoting *Krislov v. Rednour*, 226 F.3d 851, 859 (7th Cir. 2000)). As explained in

*Rednour*:

> Unlike an established party . . . a new party has not yet demonstrated a
> significant modicum of support. The established party has already
> jumped the hurdle of demonstrating its public support by receiving 5% of
> the vote in the last [relevant] election. Thus, it is neither irrational nor
> unfair to require a candidate from a new party to obtain a greater
> percentage of petition signatures to appear on the general election ballot
> than a candidate from an established party for the primary election ballot.

The two petitioning requirements contain different percentages because they are used at two different times for two different purposes.

*Rednour*, 226 F.3d at 859 (quoted in *Tripp*, 872 F.3d at 865).

Having found that the 5% signature requirement was not severe, the *Tripp* court turned to whether it was sufficiently justified by important state interests. The Supreme Court has addressed that question, concluding:

> [t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Munro v. Socialist Workers Party*, 479 U.S. 189, 193-94 (1986) (internal quotation and citation omitted) (quoted in *Tripp*, 872 F.3d at 866).

The *Tripp* court also dismissed the plaintiffs' argument that the state's interest in ballot access restrictions was illegitimate in the absence of any showing of a history of ballot clutter. The Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Tripp*, 872 F.3d at 866 (quoting *Munro*, 479 U.S. at 194–95). The *Tripp* court discussed the Supreme Court's rationale, stating:

> "If courts were to require that government defendants marshal evidence to prove actual voter confusion, such a requirement would 'necessitate that a State's political system sustain some level of damage before the legislature could take correct action.'" *Navarro v. Neal*, 716 F. 3d 425, 432 (7th Cir. 2013) (quoting *Munro*, 479 U.S. at 195). The Court has instead

endorsed a policy that permits state legislatures "to respond to potential
deficiencies in the electoral process with foresight rather than reactively."
*Munro*, 479 U.S. at 195.

*Tripp*, 872 F.3d at 866.

The conclusion of this analysis was succinctly stated, "[i]n sum, Illinois's 5%
signature requirement, standing alone, does not violate the First or Fourteenth
Amendment." *Tripp*, 872 F.3d at 866.

### b. The Notarization Requirement

The *Tripp* court turned next to the plaintiffs' claims concerning the notarization
requirement, and found "Illinois's notarization requirement, standing alone, also does
not impose a severe burden on plaintiffs' constitutional rights." *Tripp*, 872 F.3d at 866.

The *Tripp* court noted that, while not assessing the condition in depth, the
Supreme Court had upheld a notarization requirement in *American Party of Texas v.
White*, 415 U.S. 767, 778 (1974).

In *White*, the Texas Election Code required non-established parties to pursue
ballot qualification by showing evidence of support from qualified voters numbering at
least 1% of the total vote cast for governor at the last preceding election.[2] This
requirement could be met by submitting a list of qualified voters who attended a

---

[2]For the potential candidates in *White*, the 1% requirement amounted to
approximately 22,000 electors. *White*, 415 U.S. at 776.

14

precinct nominating convention, along with other pertinent information. If the party did not obtain 1% participation in the convention, it could make up the difference by obtaining signatures on supplemental petitions from qualified voters.

Each signatory was required to "be administered and sign an oath that he is a qualified voter and has not participated in any other party's nominating or qualification proceedings." The Election Code required that the oath be notarized. *White*, 415 U.S. at 778. Addressing the notarization requirement, the Supreme Court stated:

> The parties object to this requirement, but make little or no effort to demonstrate its impracticability or that it is unusually burdensome. The District Court determined that it was not, indicating that one of the plaintiff political parties had conceded as much. The District Court also found no alternative if the State was to be able to enforce its laws to prevent voters from crossing over or from voting twice for the same office. On the record before us, we are in no position to disagree.

*White*, 415 U.S. at 778.

The *Tripp* court noted that nomination petitions in Illinois could reasonably contain 20 signatures per page, there are no major limitations on who can become a notary in Illinois, the time and expense required to become a notary is not extreme, and free notary services were available. While "Illinois's notarization requirement certainly imposes some logistical burden on plaintiffs' ballot access rights," the court found "it cannot be fairly characterized as 'severe.'" *Tripp*, 872 F.3d at 869.

Further, the notarization requirement is constitutional as it is sufficiently supported by a legitimate need to protect the integrity of the electoral process. *Tripp*, 872 F.3d at 869. Illinois has a legitimate interest in prosecuting election fraud, especially

given the fact that "Illinois is a state notorious for election fraud." *Id*. (internal quotations and citations omitted). "Notarization ensures that circulators can be easily identified, questioned, and potentially prosecuted for perjury." *Id.*

The plaintiffs in *Tripp* argued that lesser restrictions such as certification under 735 Ill. Comp. Stat. 5/1-109 could combat circulator fraud, but the court declined to "enter the policy fray." *Id.* The notarization requirement did not need to be narrowly tailored because it did not impose a severe burden, and it was not a "far-afield restriction" that would suggest unreasonable behavior in dealing with circulator fraud. *Id.* at 870. The court was not concerned with the plaintiffs' arguments that the extra step of notarizing petition sheets deterred people from circulating petitions and required additional time and effort that could have been spent collecting signatures. *Id.* at 866-67.

### c. The Cumulative Impact of the Restrictions

Lastly, the *Tripp* court turned to the cumulative impact of the signature and notarization requirements, the 90-day petitioning window, and the geographic layouts of the districts. The court held the requirements were constitutional even when considered together. *Tripp*, 872 F.3d at 870-72.

The 90-day petitioning window and the geographic layout of the districts did "not dramatically tilt the constitutional scales." *Tripp*, 872 F.3d at 870. With about 30 circulators per candidate, 90 days was sufficient to collect the required number of signatures, even in the rural districts. *Id.* at 870-71.

The court supported its conclusion with cases in which it and the Supreme Court had "found more onerous signature timelines permissible." *Tripp*, 872 F.3d at 871 (citing *White*, 415 U.S. at 786–87 (fifty-five days to collect 22,000 signatures); *Stone v. Bd. of Election Comm'rs for City of Chi.*, 750 F.3d 678, 684 (7th Cir. 2014) (90 days to collect 12,500 signatures); *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) (90 days to collect 25,000 signatures).

The *Tripp* court concluded that the 90-day petitioning window did not have a significant impact on the notarization requirement, either. A circulator could notarize all of his or her sheets at the same time, before the same notary. *Tripp*, 872 F.3d at 871.

Adding in the large geographic size of the districts and the redistricting of population centers across district boundaries, the ballot restrictions remained constitutional. *Tripp*, 872 F.3d at 871-72. In so holding, the *Tripp* court noted that the size of the districts "pale in comparison to representative districts found in other parts of the United States," the districts still contained population centers, and confusion over district boundaries impacts all political parties following every redistricting. *Id.* at 872.

2. *Tripp's Application in This Case*

Bound by *Tripp*, this court finds that Defendants are entitled to summary judgment on all of Plaintiffs' claims. Plaintiffs argue that because there is no litmus test for constitutional restrictions on ballot access, the restrictions in this case are not resolved by *Tripp*. Unfortunately for Plaintiffs, they are advancing the same challenges to the

17

same restrictions at issue in *Tripp*. *Tripp* resolved those issues against the Plaintiffs' positions.

a. The 5% Signature Requirement

Plaintiffs argue that the court must ask "whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." The court agrees that is the operative question.

Here as in *Tripp*, the answer is "yes." The evidence before the court is that Gill and 18 other circulators collected 8,491 valid signatures in 90 days for Gill's candidacy. He needed 10,754. Plaintiffs argue that Gill's team worked very hard and could not have reasonably collected more signatures in the time allowed. Even if that is true, based on the average number of signatures per circulator, Gill could have collected sufficient signatures with a few more circulators, perhaps just six more.[3]

Plaintiffs argue that Gill showed a sufficient modicum of support. However, Illinois set a signature requirement of 5% of the actual turnout in the most recent election for the District as the modicum of support needed. While Gill did show that he had some support, he did not show the level of support required by Illinois' Election Code.

While "ballot access history is an important factor in determining whether restrictions impermissibly burden the freedom of political association," *Tripp*, 872 F.3d at 865, *Tripp* viewed the signature requirement not in raw numerical terms, but instead as a percentage requirement. *Tripp* noted that candidates had been able to meet the 5%

_____

[3]The candidates in *Tripp* employed thirty and thirty-four circulators. *Tripp*, 872 F.3d at 870.

signature requirement in multiple districts across multiple elections, serving as "powerful evidence that the burden of satisfying the 5% signature requirement is not severe." *Id.* (internal quotations and citations omitted). Here, very few Congressional candidates have ever collected more signatures than Gill. However, as *Tripp* viewed the requirement, candidates have been able to meet the 5% signature requirement by collecting the required *percentage* of signatures in multiple districts across multiple elections. *Id*.

Plaintiffs focus on the raw number of signatures required rather than on the actual requirement, which is a percentage. Since the signature requirement is a percentage, the total number of signatures required necessarily goes up as the number of voters increases. This is a sensible mechanism because it becomes harder to make any kind of a significant showing in an election where a larger number of people vote.

While the overall number of required signatures in this case was higher than in *Tripp*, that is simply because the actual turnout in the most recent election for the District was higher. The 13th Congressional District contains many more voters than the *Tripp* state representative districts. This numerical calculation does not change the fact that the requirement at issue here is the same 5% requirement at issue in *Tripp*. *Tripp* noted that third party and independent candidates had been able to meet the 5% requirement. *Tripp* clearly held that "Illinois's 5% signature requirement, standing alone, does not violate the First or Fourteenth Amendment." *Tripp*, 872 F.3d at 866. That holding applies to this case.

19

### b. The Notarization Requirement

This court is also bound by *Tripp*'s holding that the notarization requirement is constitutional. *Tripp* held that "Illinois's notarization requirement, standing alone, also does not impose a severe burden on plaintiffs' constitutional rights." *Tripp*, 872 F.3d at 866. While Plaintiffs suggest other ways of deterring circulator fraud, the *Tripp* court rejected the idea that courts must consider alternatives to the notarization requirement as the notarization requirement does not need to be narrowly tailored. *Id.* at 870. And, *Tripp* dismissed Plaintiffs' concerns that the notarization requirement adds an extra step, requiring additional time and effort that could have been spent collecting signatures. *Id.* at 866-67, 871.

In arguing that the notarization requirement is unconstitutional, Plaintiffs emphasize the fact that independent candidates need many more signatures to be on the general election ballot than party candidates need to be on a primary ballot. This emphasis is misplaced, however, because "comparing the petitioning requirements for an 'established' party's candidate in a primary election and a 'new' party's candidate in a general election" is to "compare apples with oranges." *Tripp*, 872 F.3d at 865 (quoting *Rednour*, 226 F.3d at 859). The notarization requirement was constitutional in *Tripp*, and it remains constitutional in this case.

### c. The Cumulative Impact of the Restrictions

Lastly, *Tripp* specifically considered the cumulative impact of the signature and notarization requirements, the 90-day petitioning window, and the geographic layouts of the districts with split population centers, holding that the requirements were

20

constitutional even when considered together. *Tripp*, 872 F.3d at 871-72. The considerations are the same in this case.

The 90-day petitioning window and the geographic layout of the districts do "not dramatically tilt the constitutional scales." *Id.* at 870. Courts have upheld even more onerous signature timelines, and the notarization requirement is not overly burdensome on the time frame because the sheets can all be notarized at the same time, before the same notary. *Id.* at 871. The *Tripp* court also noted that other representative districts were larger than the ones at issue in that case. *Id.* at 871. Here, while the District is large, it is not even the largest Congressional District in Illinois, and it pales in comparison with the size of other Congressional Districts across the country. And, while some population centers are split across the boundary of the District, *Tripp* dismissed concerns over boundary lines drawn to split population centers. *Id.* at 872.

*Tripp* held that the 5% signature requirement, the notarization requirement, and the 90-day petitioning window were constitutional even in large, predominantly rural districts with population centers split across districts. Plaintiffs here challenge the same requirements in their large, predominantly rural District with some of its population centers split across the District's boundaries. Because the court in *Tripp* held those requirements constitutional under the same circumstances, this court must conclude that the challenged restrictions here are also constitutional, even when considered cumulatively.

### III. CONCLUSION

Based upon the Seventh Circuit's decision in *Tripp*, the court holds that the 5% signature requirement, the notarization requirement, and the cumulative impact of restrictions on ballot access do not violate the First or Fourteenth Amendments to the Constitution. Therefore, the court DENIES Plaintiffs' Motion for Summary Judgment, and GRANTS Defendants' Motion for Summary Judgment.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiffs' Motion for Summary Judgment (#41) is DENIED.

(2) Defendants' Motion for Summary Judgment (#42) is GRANTED. Judgment is entered in favor of Defendants and against Plaintiffs.

(3) The Final Pretrial Conference and Jury Trial dates are VACATED.

(4) This case is terminated.

ENTERED this 18th day of December, 2018.

s/COLIN S. BRUCE
U.S. DISTRICT JUDGE