E-FILED
Thursday, 31 March, 2022  09:44:20 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| DAVID M. GILL, DAWN MOZINGO, DEBRA KUNKEL, LINDA R. GREEN, DON NECESSARY, and GREG PARSONS, ) ) ) ) Plaintiffs, ) ) ) v. ) ) CHARLES W. SCHOLZ, IAN K. LINNABARY, WILLIAM J. CADIGAN, LAURA K. DONAHUE, WILLIAM R. HAINE, WILLIAM M. MCGUFFAGE, KATHERINE S. O'BRIEN, AND CASSANDRA B. WATSON,[1] ) ) ) ) ) ) ) ) ) ) ) Defendants. ) | Case No. 3:16-cv-03221-SLD-EIL |

ORDER

Plaintiff David M. Gill aspired to represent the 13th Congressional District of Illinois in the United States House of Representatives. To achieve that goal, he filed nominating petitions to be an independent candidate in the November 2016 election. Although he collected more than the required number of signatures, an objection was filed, and the Illinois State Officers Electoral Board found that the number of valid signatures fell below the requirement. He brings suit, alleging that certain provisions of Illinois's election laws, individually and in combination with the characteristics of the 13th Congressional District, violate the First and Fourteenth Amendments. Before the Court is Defendants Charles W. Scholz, Ian K. Linnabary, William J. Cadigan, Laura K. Donahue, William R. Haine, William M. McGuffage, Katherine S. O'Brien,

---

[1] The members of the Illinois State Board of Elections ("ISBE") are sued in their official capacities. *See* Compl. 1, ECF No. 1. Pursuant to Federal Rule of Civil Procedure 25(d), the new members of the ISBE, Ian K. Linnabary, Laura K. Donahue, William R. Haine, and Katherine S. O'Brien, are substituted for their predecessors, Andrew K. Carruthers, Betty J. Coffrin, Ernest L. Gowen, and John R. Keith. *See* Defs.' Second Mot. Summ. J. 1 n.1, ECF No. 58. The Clerk is directed to update the docket accordingly.

and Cassandra B. Watson's renewed motion for summary judgment, ECF No. 58, and Gill and

fellow Plaintiffs Dawn Mozingo, Debra Kunkel, Linda R. Green, Don Necessary, and Greg

Parsons's renewed cross-motion for summary judgment, ECF No. 62.  For the following reasons,

Defendants' renewed motion for summary judgment is GRANTED, and Plaintiffs' renewed

cross-motion for summary judgment is DENIED.

**BACKGROUND[2]**

**I.      Factual Background**

Gill is a resident of Bloomington, Illinois.  In advance of the 2016 election, he filed

nominating petitions to be an independent candidate for a position representing the 13th

Congressional District of Illinois in the U.S. House of Representatives.  Mozingo, Kunkel,

Green, Necessary, and Parsons are registered voters in the 13th Congressional District who

wished to vote for Gill in the election.  They circulated and/or signed Gill's petition.  Scholz,

Linnabary, Cadigan, Donahue, Haine, McGuffage, O'Brien, and Watson are the current

members of the Illinois State Board of Elections ("ISBE").  When an objection to nomination

papers is filed, these same parties constitute the State Officers Electoral Board ("SOEB").

For an independent candidate to appear on a ballot in Illinois, he must submit a total

number of signatures from registered voters in his district that equals or exceeds five percent of

the voters who voted in the most recent general election, 10 ILCS 5/10-3[3]; all signatures must be

---

[2] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, the factual background of this case is drawn from Defendants' statement of undisputed material facts, Defs.' Second Mot. Summ. J. 3–12; Plaintiffs' response to Defendants' statement, Pls.' Resp. Statement Material Facts 1–22, ECF No. 61-1; Plaintiffs' statement of undisputed material facts, Pls.' Statement Undisputed Material Facts 1–17, ECF No. 62-1; Defendants' reply to Plaintiffs' response and their response to Plaintiffs' additional material and immaterial facts, Defs.' Reply & Resp. to Mots. Summ. J. 3–11, ECF No. 67; Plaintiffs' reply to Defendants' response, Pls.' Reply to Mot. Summ. J. 1, ECF No. 69; and exhibits to the filings.

[3] For the first election following a redistricting of congressional districts, the number of signatures required shifts to 5,000.  10 ILCS 5/10-3.  The five percent requirement applies in all other elections.

collected during the 90 days preceding the last day for filing the petition, 10 ILCS 5/10-4.  At the bottom of each sheet of the petition, the collector of the signatures must add a statement certifying that the signatures were signed in his presence and are genuine; the statement must be notarized by an officer authorized to administer oaths.  *Id*.

Per the five percent requirement, Gill was required to collect and submit a minimum of 10,754 signatures from voters in the 13th Congressional District between March 29, 2016 and June 27, 2016.  On June 27, 2016, Gill filed petitions containing approximately 11,350 signatures; he had personally gathered nearly 5,000 signatures himself.  Eighteen other petition circulators worked with him to gather signatures.

Any legal voter of the relevant district may file an objection to the nominating papers of a candidate within five business days of the last day for filing nominating papers; nominating papers that are "in apparent conformity with the [signature requirements], shall be deemed to be valid" unless such an objection is made.  10 ILCS 5/10-8.  On July 5, 2016, Jerrold Stocks, a voter in the 13th Congressional District, filed an objection to Gill's nominating papers.  After reviewing the records and conducting administrative proceedings, the SOEB determined that 8,593 of the signatures submitted by Gill were valid.  It revised that number to 8,491 after further review.  Because Gill had fewer than the 10,754 required to appear on the ballot, the SOEB decided that his name would not be printed on the ballot for the November 2016 election.

## II.    Procedural History

Plaintiffs initiated this suit on August 2, 2016.  Compl., ECF No. 1.  They bring four claims.  In Count I, they allege that the notarization requirement, standing alone, violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment both facially and as applied to the 13th Congressional District.  *Id*. at 7–12.  In Counts II and III, they allege

that the five percent minimum signature requirement, standing alone, violates the First

Amendment and the Equal Protection Clause of the Fourteenth Amendment both facially and as

applied. *Id*. at 12–18.  In Count IV, they allege that cumulatively, the notarization requirement,

the five percent minimum signature requirement, the 90-day signature gathering period, and the

rural nature and splitting of population centers in the 13th Congressional District violate the First

Amendment and the Equal Protection Clause of the Fourteenth Amendment (Count IV).  *Id*. at

18–21.  Plaintiffs request declaratory and injunctive relief, along with costs and expenses of the

suit.  *Id*. at 11–12, 14, 18, 21.

After Plaintiffs filed their complaint, they filed a motion for a preliminary injunction,

Mot. Prelim. Inj., ECF No. 4, which Judge Sue E. Myerscough[4] granted on August 25, 2016,

Aug. 25, 2016 Order, ECF No. 15.  The preliminary injunction enjoined Defendants from

enforcing the signature requirement against Gill and, as such, "require[d] that Gill remain on the

ballot."  *Id*. at 26.  Defendants appealed, Aug. 26, 2016 Not. Appeal, ECF No. 16, and the

Seventh Circuit stayed the injunction pending resolution of the appeal, Sept. 9, 2016 Order, ECF

No. 21.  The Seventh Circuit subsequently mooted the appeal, as the election had already taken

place.  Dec. 6, 2016 Order, ECF No. 24.

Plaintiffs filed a motion for summary judgment on July 26, 2018, Pls.' First Mot. Summ.

J., ECF No. 41, and Defendants filed a cross-motion for summary judgment on August 20, 2018,

Defs.' First Mot. Summ. J., ECF No. 42.  Judge Colin S. Bruce denied Plaintiffs' motion for

summary judgment and granted Defendants' motion for summary judgment.  Dec. 18, 2018

Order 1, ECF No. 47.  He found that the Seventh Circuit's decision in *Tripp v. Scholz*, 872 F.3d

---

[4] Judge Myerscough was originally assigned to this case, but it was reassigned to Judge Colin S. Bruce on November 8, 2018.  *See* Nov. 8, 2018 Text Order.  It was then reassigned to Judge Harold A. Baker, *see* Aug. 30, 2021 Text Order, before being finally reassigned to this Court, *see* Sept. 7, 2021 Text Order.

857 (7th Cir. 2017), was directly on point, and he resolved the summary judgment motions on each count according to that decision.  *Id*. at 8, 17–21.  Plaintiffs appealed.  Jan. 17, 2019 Not. Appeal, ECF No. 49.

On June 18, 2020, the Seventh Circuit reversed Judge Bruce's decision and remanded the case.  *Gill v. Scholz*, 962 F.3d 360, 361 (7th Cir. 2020).  The court found that Judge Bruce had "erred by automatically concluding that the holding in *Tripp* controls this case" instead of applying the fact-based balancing test established by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).  *Gill*, 962 F.3d at 365–66 (noting that "the facts in *Tripp* do not align with Gill's challenge").  As such, it remanded the case so the district court could carry out the test.  *Id*. at 366–67.[5]  Defendants and Plaintiffs have both filed renewed motions for summary judgment, Defs.' Second Mot. Summ. J.; Pls.' Second Mot. Summ. J.,[6] which the Court will now resolve.

---

[5] The Seventh Circuit held that, although the 2016 election had passed, "a justiciable controversy remained under the 'capable of repetition, yet evading review' doctrine."  *Gill*, 962 F.3d at 363 n.3.  "Under that well-recognized exception to mootness, a claim still presents a justiciable controversy if (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  *Id*. (quotation marks omitted).  The court found that "[b]oth factors were met in this case: Gill was unable to litigate his claims before the November 2016 election was held, and he has expressed his intent to run for office in 2020."  *Id*.  For the same reasons, the Court finds that Plaintiffs' claims are not moot; Gill indicated as recently as March 2021 that he intends to run again as an independent candidate for the House of Representatives in Illinois.  *See* Gill Decl. ¶ 5, Pls.' Reply Ex. A, ECF No. 69-1; *see also Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 947–48 (7th Cir. 2019) (finding that "[t]hough the election is over, [the candidate's] claim is not moot because it is capable of repetition, yet evading review": the period prior to the previous election was too short to allow litigation of the action and the candidate "has expressed his intention to run for office . . . again"); *Lee v. Keith*, 463 F.3d 763, 767 (7th Cir. 2006) (finding the case to not be moot after the election was over because "[t]he statutes [the plaintiff candidate] challenges thwarted his bid to appear on the ballot and continue to restrict potential independent candidacies for the Illinois General Assembly").

[6] Defendants seek summary judgment on all four claims.  Defs.' Second Mot. Summ. J. 15–28.  Plaintiffs appear to reference only Count IV, regarding the cumulative effect of Illinois's election regulations and the 13th Congressional District's geography.  *See* Pls.' Resp. Opp'n Defs.' Second Mot. Summ. J. 11–24, ECF No. 61 (addressing only the regulations and other factors in combination); Pls.' Second Mot. Summ. J. 10–18 (same).  Arguably, Plaintiffs have waived the issues in Counts I, II, and III.  *See Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 ("The nonmoving party waives any arguments that were not raised in response to the moving party's motion for summary judgment.").  The Court will nevertheless address Counts I, II, and III in full, as its analyses in those sections will be relevant to its analysis as to Count IV.  *See, e.g.*, *Tripp*, 872 F.3d at 864–72 (examining the challenged provisions individually before analyzing them in combination).  The Court will, however, treat Plaintiffs' motion as a motion for summary judgment on Count IV only.

## DISCUSSION

### I.    Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where one party has properly moved for summary judgment, the nonmoving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Parties may not merely refer to their own pleadings, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), but must instead "cit[e] to particular parts of materials in the record, including depositions, documents, [and] . . . affidavits or declarations" or show "that the materials cited do not establish the absence or presence of a genuine dispute," Fed R. Civ. P. 56(c)(1).[7]  The court is to "constru[e] the record in the light most favorable to the nonmovant," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the nonmovant]," *Grant*, 870 F.3d at 568.  However, the nonmovant "is not entitled to the benefit of inferences that are supported by only speculation or conjecture."  *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (quotation marks omitted).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment . . . ."  *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).  The court simply "construe[s] all inferences in favor of the party against whom the motion under

---

[7] "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002)

(quotation marks omitted).

## II.    Analysis

"It is well-settled that [t]he impact of candidate eligibility requirements on voters

implicates basic constitutional rights to associate politically with like-minded voters and to cast a

meaningful vote." *Stone v. Bd. of Election Comm'rs for City of Chi.*, 750 F.3d 678, 681 (7th Cir.

2014) (alteration in original) (quotation marks omitted).  However, "not all restrictions imposed

by the States . . . impose constitutionally-suspect burdens" on these rights.  *Anderson*, 460 U.S.

at 788.  "States may, and inevitably must, enact reasonable regulations of parties, elections, and

ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New

Party*, 520 U.S. 351, 358 (1997).

"[T]here is no litmus-paper test to separate valid from invalid restrictions." *Stone*, 750

F.3d at 681 (quotation marks omitted).  Rather, a court must conduct "a practical assessment of

the challenged scheme's justifications and effects." *Acevedo v. Cook Cnty. Officers Election Bd.*,

925 F.3d 944, 948 (7th Cir. 2019).  Courts carry out this analysis using the *Anderson-Burdick*

balancing test, *id.*, under which the court

> must first consider the character and magnitude of the asserted injury to the rights
> protected by the First and Fourteenth Amendments that the plaintiff seeks to
> vindicate.  It must then identify and evaluate the precise interests put forward by
> the State as justifications for the burden imposed by its rule.  In passing judgment,
> the [c]ourt must not only determine the legitimacy and strength of each of those
> interests; it must also consider the extent to which those interests make it
> necessary to burden the plaintiff's rights.  Only after weighting all these factors is
> the reviewing court in a position to decide whether the challenged provision is
> unconstitutional.

*Anderson*, 460 U.S. at 789.  When the plaintiff's rights "are subjected to severe restrictions, the

regulation must be narrowly drawn to advance a state interest of compelling importance."

7

*Burdick*, 504 U.S. at 434 (quotation marks omitted).  "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions."  *Id.* (quotation marks omitted).  The Supreme Court has acknowledged that deciding whether a provision is unconstitutional is "very much a matter of degree" and that "[w]hat the result of this process will be in any specific case may be very difficult to predict with great assurance."  *Storer v. Brown*, 415 U.S. 724, 730 (1974) (quotation marks omitted).[8]

### a.  Notarization Requirement, Individually (Count I)

The Court turns first to the question of whether the notarization requirement, standing alone, violates the First and Fourteenth Amendments.  10 ILCS 5/10-4 provides that

> [a]t the bottom of each sheet of [a] petition [for nomination] shall be added a circulator's statement, . . . certifying that the signatures on that sheet of the petition were signed in his or her presence; certifying that the signatures are genuine; and either (1) indicating the dates on which that sheet was circulated, or (2) indicating the first and last dates on which the sheet was circulated, or (3) certifying that none of the signatures on the sheet were signed more than 90 days preceding the last day for the filing of the petition; and certifying that to the best of his knowledge and belief the persons so signing were at the time of signing the petition duly registered voters . . . of the political subdivision or district for which the candidate or candidates shall be nominated, and certifying that their respective residences are correctly stated therein.  *Such statements shall be sworn to before some officer authorized to administer oaths in this state.*

---

[8] Courts routinely cite Supreme Court cases predating *Anderson* and *Burdick* when addressing questions about the constitutionality of state election laws, continuing to treat them as valid precedent.  *See, e.g.*, *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 773–75 (7th Cir. 1997) (citing to *Anderson* and *Burdick* along with a variety of Supreme Court opinions predating those cases, including *Storer*).  As the Sixth Circuit explained in *Green Party of Tennessee v. Hargett*, 767 F.3d 533 (6th Cir. 2014):

> [T]he Supreme Court has continued to treat [pre-*Anderson* and *Burdick*] cases as valid precedent. [The court] understand[s] *Anderson* and *Burdick* to clarify the proper analysis a court should use in evaluating an election-law claim, without calling into question the Supreme Court's determination[s] [in these earlier cases].  Furthermore, the Court's older precedent is consistent with *Anderson* and *Burdick* in acknowledging that the severity of a burden significantly influences a court's analysis.

*Id.* at 546 n.2 (citation omitted).

(emphasis added).  In Count I, Plaintiffs allege that the notarization requirement "places a severe burden" on the candidate and voters interested in seeing the candidate on the ballot because "[n]otaries are not always available at times when circulators have an opportunity to seek their services," notarization often costs money, and repeat trips to the notary might be necessary for circulators who gather more than a few sheets.  Compl. 9. They further assert that "no State interest . . . is served by this *a priori* notarization requirement" because if an objection is filed, the SOEB has to compare the signatures on the petition sheets to signatures obtained from various election authorities to determine the signatures' validity anyway.  *Id*. at 8.

The Court finds that the notarization requirement, both facially[9] and as applied, does not pose a severe burden.  First, Illinois does not strictly limit who can become a notary.  *See* Notary Public Application Checklist, Defs.' Second Mot. Summ. J. Ex. 5, ECF No. 58-5 (noting that an applicant must pay a $10 filing fee, obtain a $5,000 Illinois Notary Public Bond, provide a copy of his driver's license or state ID, and get his signature notarized by a current Notary Public); Illinois Notary—Bonds and Insurance 1, Defs.' Second Mot. Summ. J. Ex. 4, ECF No. 58-4 (indicating that a $5,000 Illinois Notary Public Bond can be purchased for $30.00).  The situation is therefore unlike that in *Perez-Guzman v. Gracia*, 346 F.3d 229 (1st Cir. 2003), in which the First Circuit found Puerto Rico's notarization requirement to pose a severe burden in part because only licensed attorneys could become notaries, making the supply "inelastic."  *Id*. at 240.  Indeed, there is nothing to stop one or several petition circulators for a candidate from becoming a notary and notarizing the petition sheets.  *See Tripp v. Smart*, Case No. 14-cv-0890-

---

[9] A facial challenge "asserts that a statute is invalid on its face as written and authoritatively construed, when measured against the applicable substantive constitutional doctrine, without reference to the facts or circumstances of particular applications."  *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (quotation marks omitted).

MJR-PMF, 2016 WL 4379876, at *5 (S.D. Ill. Aug. 17, 2016), *aff'd sub. nom. Tripp v. Scholz*,

872 F.3d 857 (7th Cir. 2017) (finding the Illinois notarization requirement to not pose a severe

burden because "the time and expense to become a notary in Illinois is not extreme" and so

"circulators could become notaries to ease things").

   Second, Plaintiffs do not argue or provide evidence that notarization is prohibitively

expensive or that a candidate is *required* to pay for notarization services, effectively constituting

a mandatory fee.  *Cf. Green Party of Pa. v. Aichele*, 89 F. Supp. 3d 723, 743–44 (E.D. Pa. 2015)

(finding that a notarization requirement imposed a severe burden because of a mandatory

minimum fee of $5.00 per signature).  Evidence regarding the cost of notarization or indicating

that such a cost dissuaded Plaintiffs from obtaining more signatures is absent from Plaintiffs'

briefing.  *See also Tripp*, 2016 WL 4379876, at *5 (noting that many communities around the

country, including in Illinois, offer free notary services).

   Third, Illinois requires one notary signature per page of a petition and does not set a

maximum number of voter signatures that can be contained on a page.  *See* 10 ILCS 5/10-4.

This requirement is much less onerous than the one struck down in *Perez-Guzman*, which

required that each *signature* be notarized.  *See* 346 F.3d at 239.  Gill asserts that his standard

petition page contains spots for fifteen signatures.  Gill Suppl. Aff. ¶ 15, Defs.' Second Mot.

Summ. J. Ex. 8, ECF No. 58-8.  With 10,754 signatures at fifteen per page, Gill would need

approximately 717 notarizations; if he modified his petition page to contain spots for twenty

signatures, he would need 538 notarizations.  While certainly not easy, the Court does not

believe this to be so burdensome as to prevent Gill from accomplishing it—indeed, Gill does not

argue that he was unable to have each page of his petitions, containing nearly 11,350 signatures

in total, notarized.  *See Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)

("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."); *see also Tripp*, 872 F.3d at 869 ("[A]lthough Illinois's notarization requirement certainly imposes some logistical burden on plaintiffs' ballot access rights, it cannot be fairly characterized as 'severe.'").[10]

As the notarization requirement does not impose a severe burden, it need not be narrowly drawn to advance a compelling state interest, *Stone*, 750 F.3d at 681; rather, it "need only be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation," *Tripp*, 872 F.3d at 869 (quotation marks omitted). Defendants assert that "[t]he notarization requirement is an important antifraud measure that serves the vital state interest in maintaining an honest election process." Defs.' Second Mot. Summ. J. 15. This is a legitimate interest sufficient to justify the requirement. *See, e.g*., *In re Armentrout*, 457 N.E.2d 1262, 1267 (Ill. 1983) (detailing the harm caused by the forging of signatures on ballot petitions). "Notarization ensures that circulators can be easily identified, questioned, and potentially prosecuted for perjury." *Tripp*, 872 F.3d at 869.[11]

Other federal courts evaluating similar requirements have come to the same conclusion. *See Richards v. Dayton*, Civil No. 13-3029 (JRT/JSM), 2015 WL 1522199, at *16 n.17 (D. Minn. Jan. 30, 2015) (collecting cases that "have upheld notarization requirements in the absence of some evidence that the statute at issue is unusually burdensome"). For example, the Seventh

---

[10] The Court also notes that the notarization requirement is not limited to independent candidates—candidates from established parties must have each page of a petition notarized. *See* 10 ILCS 5/7-10.

[11] Plaintiffs allege in the complaint that the certification procedure contained in Illinois's Code of Civil Procedure is a better alternative to the notarization requirement. Compl. 8; *see* 735 ILCS 5/1-109 (providing that an individual may certify in writing that the statements set forth in a document are true and correct "with the same force and effect as though subscribed and sworn to under oath, and there is no further requirement that the pleading, affidavit, or other document be sworn before an authorized person"). They do not make this argument in their briefing on the instant motions. Regardless, because the notarization requirement does not impose a severe burden, it need not be narrowly tailored, merely justified by a legitimate government interest. *See Burdick*, 504 U.S. at 434; *see also Hall v. Simcox*, 766 F.2d 1171, 1174 (7th Cir. 1985) ("The courts may sometimes talk the language of least drastic means but they only strike down ballot-access regulations that are unreasonable . . . .").

Circuit found in *Tripp* that Illinois's notarization requirement, as applied to the facts of that particular case, did not violate the First Amendment, 872 F.3d at 866–70, and in *American Party of Texas v. White*, 415 U.S. 767 (1974), the Supreme Court agreed with the district court that a requirement that petition signatures be notarized was not "unusually burdensome" and that there was "no alternative if the State was to be able to enforce its laws," *id*. at 787.

The Court thus finds that Illinois's notarization requirement, standing alone, does not violate the First or Fourteenth Amendment.  Defendants are entitled to summary judgment on Count I.

### b.  Five Percent Requirement, Individually (Counts II and III)

The Court next considers the five percent requirement, standing alone.  10 ILCS 5/10-3 provides that

> [n]ominations of independent candidates for public office within any district or political subdivision less than the State, may be made by nomination papers signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% . . . of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area.

In Counts II and III of the complaint, Plaintiffs allege that this requirement, facially and as applied to the 13th Congressional District, violates the First and Fourteenth Amendments. Compl. 12–18.  The theory underlying each count differs: in Count II, the focus is on the geography of the district and its rural nature, which allegedly make it more difficult for circulators to obtain signatures than in more compact and dense districts, *id*. at 12–14, while in Count III, Plaintiffs assert that the five percent requirement is unconstitutional because candidates from established parties need to obtain signatures from a lower percentage of prior voters and because independent candidates for Senate need to obtain a proportionally lower

12

number of signatures compared to established-party candidates for Senate, unfairly imposing a more severe burden on the independent candidates running for the House of Representatives, *id*. at 14–18.

The Court first notes that many courts, including the Supreme Court, have upheld state election laws requiring certain candidates to obtain signatures from five percent of the entire eligible voting base. *See Jenness v. Fortson*, 403 U.S. 431, 433, 442 (1971) (upholding a requirement that a candidate from an unestablished party obtain signatures from five percent of the number of electors eligible to vote in the previous election to appear on the ballot); *American Party*, 415 U.S. at 789 (requiring signatures that equal three percent or five percent of the vote is not facially invalid); *see also Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 775 (7th Cir. 1997) ("In light of *Jenness* . . . and several other cases, the [plaintiff] cannot argue that the 5% petitioning requirement is severe on its face.").  Moreover, the statute at hand limits the base to voters who actually voted in previous elections, whereas in other cases approving similar percentage rules, such as *Jenness*, "the base was all registered voters" and thus constitutes "a larger base than actual voters in a particular election, as here." *Hall v. Simcox*, 766 F.2d 1171, 1173–74 (7th Cir. 1985).  While the Court must evaluate the facts of this case independently, it is difficult, in the face of the repeated upholding of five percent requirements, to find that Illinois's five percent requirement here facially violates the Constitution.

The Court also does not find that limiting the five percent requirement to independent candidates (and those from unestablished parties) without requiring established-party candidates to do the same constitutes "invidious discrimination." *Jenness*, 403 U.S. at 441.  The Supreme Court has held that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political

13

organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id*. at 442. An established party in Illinois must continually demonstrate such a "modicum of support," *id*.—to remain established, it must continually receive more than five percent of the entire vote cast for Governor of Illinois, or, if it did not nominate a candidate for Governor, then it must continue to receive more than five percent of all the votes cast for offices for which it nominated candidates within a particular district or subdivision to remain an established party within that district or subdivision. 10 ILCS 5/10-2. Moreover, an established-party candidate must obtain at least 5,000 signatures to appear as a delegate to a national nominating convention for a statewide office, or at least 0.5% of the qualified primary electors of his party for congressional office. 10 ILCS 5/7-10.

Independent candidates, however, may appear on the ballot in the general election solely by collecting the requisite number of signatures, and thus they need not continually demonstrate community support, like established parties must do, or win a primary like candidates seeking to represent established parties. *See Jenness*, 403 U.S. at 440 (finding that "the premise that it is inherently more burdensome for a candidate to gather the signatures of 5% of the total eligible electorate than it is to win the votes of a majority in a party primary . . . . cannot be uncritically accepted" (footnote omitted)). With such vastly different requirements, "[c]omparing the petitioning requirement for an 'established' party's candidate in a primary election and a 'new' party's [or an independent] candidate in a general election" is akin to "compar[ing] apples with oranges." *See Rednour*, 108 F.3d at 771, 776 (noting that in Illinois, candidates from unestablished parties and independent candidates "must satisfy nearly identical nominating requirements to appear on the general election ballot"); *see also American Party*, 415 U.S. at

14

782–83 (finding that since established parties must continuously demonstrate support from the community in each election to maintain that status, "whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner"); *Jenness*, 403 U.S. at 441–42 (acknowledging that "there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other" and finding that the State was not "guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot").[12]

As far as the difference between the number of signatures an independent candidate for Senate must collect compared to an independent candidate for the House of Representatives, neither the Supreme Court nor the Seventh Circuit, in cases involving the differences between petitions for Senate and House candidates, have expressed a general opposition to lack of proportional equality between these two different races.  In *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979), the Supreme Court addressed the objection of the Socialist Workers Party, an unestablished party, to the requirement that statewide candidates had to obtain 25,000 signatures but candidates for political subdivisions had to follow the five percent requirement because it had resulted in a situation where a candidate for the subdivision in Chicago needed more than 25,000 signatures—a greater number than a candidate for Senate, a

---

[12] In 2008, the Seventh Circuit addressed a challenge to Illinois's different signature requirements for years following redistricting and years not following redistricting.  In *Stevo v. Keith*, 546 F.3d 405 (7th Cir. 2008), the plaintiff argued that the 5,000 signature requirement in years following a redistricting and the five percent requirement in years not following a redistricting constituted disparate treatment.  *Id.* at 407.  The Seventh Circuit rejected this argument, stating that redistricting can be "disorienting," as "[c]andidates and voters alike must adjust to the new political landscape," and that therefore "[i]t is plausible that it would be more difficult for candidates to obtain signatures in such circumstances, and so the required number is reduced" to 5,000.  *Id.* at 408.  It found that the plaintiff's proposal for making 5,000 the requirement for every election would be "as or more arbitrary"—"at best [arguments in favor of a universal flat number] make[] the choice between number and percentage a standoff; it does not justify invalidating the percentage approach."  *Id.*

statewide office.  *Id*. at 175–77.  Because the ISBE "advanced no reason . . . why the State needs a more stringent requirement for Chicago" than for statewide elections, the Court held that "the Illinois Election Code is unconstitutional insofar as it requires independent candidates and new political parties to obtain more than 25,000 signatures in Chicago."  *Id*. at 186.  The Seventh Circuit addressed this case in *Bowe v. Board of Election Commissioners of the City of Chicago*, 614 F.2d 1147 (7th Cir. 1980), and disagreed with Bowe's position that *Socialist Workers Party* "stands for the broad proposition that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision."  *Id*. at 1151.  Thus, there is no obligation that the proportions between Senate and House signature requirements remain the same from district to district, lest they be considered invidious discrimination.

The Court turns next to the application of the five percent requirement, standing alone, to the 13th Congressional District.  While, as noted above, the percentage is relevant to whether the requirement constitutes a severe burden, "to assess realistically whether the law imposes excessively burdensome requirements upon independent candidates it is necessary to know other critical facts," in particular the actual number of signatures that needs to be obtained to achieve that percentage.  *See Storer*, 415 U.S. at 739.  Plaintiffs and Defendants agree that, to appear on the ballot in 2016, Gill needed to obtain 10,754 valid signatures.  Defs.' Second Mot. Summ. J. 4–5; Pls.' Resp. Statement Material Facts 3, ECF No. 61-1.

The Court does not find that the requirement that Gill obtain 10,754 signatures, standing alone, imposed a severe burden on him such that no reasonably diligent candidate could be expected to achieve this number.  *See Stone*, 750 F.3d at 682 ("What is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent

candidate could be expected to be able to meet the requirements and gain a place on the ballot." (quotation marks omitted)).  Plaintiffs' own expert, Richard Winger, testified that there have been other independent and new party House of Representatives candidates who have collected around this number of signatures.  *See* Winger Dep. 28:7, Defs.' Second Mot. Summ. J. Ex. 9, ECF No. 58-9 (Wendall Fant collected 16,292 signatures); *id.* (Franzier Reams collected 12,919 signatures); *id.* at 28:8 (Jack Gargan collected 12,141 signatures); *id.* at 28:18–19 (H. Douglas Lassiter collected more than 8,593 signatures); *id.* at 37:17–18 (Cindy Sheehan collected 10,198 signatures); *id.* at 37:19–20 (Steve Kelly collected 10,186 signatures); *id.* at 38:6 (Stephen Wheeler collected 10,191 signatures); *id.* at 38:12 (David Golding collected 9,803 signatures); *id.* at 38:13 (Samuel Grove collected 9,100 signatures); *id.* at 38:16–17 (John Hager collected 9,758 signatures).[13]

In light of the fact that other House candidates across the country have obtained more than 10,754 signatures or nearly that amount, it does not strike the Court that no reasonably diligent candidate could collect this number of signatures.  Gill himself came fairly close: he and his circulators obtained nearly 11,350 signatures, 5,000 of which Gill himself collected.  Gill Suppl. Aff. ¶ 3.  Although only 8,491 of these were ultimately deemed valid, Defs.' Second Mot. Summ. J. 5; Pls.' Resp. Statement Material Facts 4, with a few more diligent petition circulators, it is reasonable that he could have collected enough to satisfy the five percent requirement, even accounting for a cushion in case of invalidations, *see Krislov v. Rednour*, 226 F.3d 851, 859–60 (7th Cir. 2000) ("In reality a candidate needs a surplus of signatures, because they will likely be challenged on any number of grounds, resulting in some, perhaps many, invalidations."); *see*

---

[13] As a reminder, at this point the Court is addressing only the issue of whether the five percent requirement, standing alone, violates the Constitution.  It will address whether the five percent requirement cumulatively with other factors present in the 13th Congressional District violates the Constitution, including whether a reasonably diligent candidate could succeed under those conditions, in the following section.  *See infra* Section II(c).

*also McDonald v. Cook Cnty. Officers' Electoral Bd.*, No. 18 C 1277, 2018 WL 1334931, at \*6 (N.D. Ill. Mar. 15, 2018) (stating that "what is relevant about [the plaintiff candidate's] efforts is how many signatures she obtained and how close she was to being placed on the ballot").  While this would require perhaps more than the eighteen petition circulators he already had, it is well recognized that "[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization."  *See American Party*, 415 U.S. at 787.  Moreover, the Illinois Election Code allows candidates to hire paid circulators to gather petition signatures on their behalf, 10 ILCS 5/10-4, even if, as Winger argues, this may be harder than it seems because paid petition circulators may not circulate petitions for both independent candidates and candidates from established parties, *see* Winger Dep. 41:9–13 ("It is tough for independent candidates to hire paid circulators because the odds are high that many of them will have already worked on a primary petition and then they aren't available to work on the independent's petition."); *see* 10 ILCS 5/10-4 ("[N]o person shall circulate or certify petitions for candidates of more than one political party, or for an independent candidate or candidates in addition to one political party . . . .").

　　Having found that the five percent requirement, standing alone, does not impose a severe burden on Plaintiffs' rights, the Court now looks to whether Illinois has a legitimate justification for the requirement.  *See Burdick*, 504 U.S. at 434.  Defendants point to the need for States to ensure that independent candidates "have some modicum of support before gaining ballot access," as "ballots are finite in size and elections are complicated and expensive to run," and assert that "[p]etition signature requirements are the main way to demonstrate this modicum of support."  Defs.' Second Mot. Summ. J. 20.  A State's interest in ensuring that its elections are orderly—which includes making sure ballots are not overcrowded so that voters are not confused—is well recognized by courts all the way up to the Supreme Court.  *See, e.g.*,

*Timmons*, 520 U.S. at 366–67 ("States also have a strong interest in the stability of their political

systems . . . . [which] permits them to enact reasonable election regulations that may, in practice,

favor the traditional two-party system, and that temper the destabilizing effects of party

splintering and excessive factionalism." (citations and footnote omitted)); *Munro v. Socialist*

*Workers Party*, 479 U.S. 189, 193 (1986) ("It is now clear that States may condition access to the

general election ballot by a minor-party or independent candidate upon a showing of a modicum

of support among the potential voters for the office."); *Rednour*, 108 F.3d at 776 ("[I]t is neither

irrational nor unfair to require a candidate from a new party [or an independent candidate] to

obtain a greater percentage of petition signatures to appear on the general election ballot than a

candidate from an established party for the primary election ballot" because the "new party [or

independent candidate] has not yet demonstrated a significant modicum of support[.]").  And the

Supreme Court has made it clear that it does not "require[] a State to make a particularized

showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous

candidacies prior to the imposition of reasonable restrictions on ballot access."  *Munro*, 479 U.S.

at 194–95.  The Court finds that Defendants have presented a legitimate reason sufficient to

justify the five percent requirement.

Accordingly, Defendants are entitled to summary judgment on Counts II and III.

### c. Cumulative Requirements (Count IV)[14]

Finally, the Court will address whether the challenged provisions, in combination and

along with the geographical characteristics of the 13th Congressional District, violate the

Constitution.  Along with the notarization requirement, 10 ILCS 5/10-4, and the five percent

---

[14] Plaintiffs argue that as Defendants "offer[] no defense against [Plaintiffs'] central claim that the challenged provisions are unconstitutional as applied in combination, [they are] not entitled to summary judgment as to that claim."  Pls.' Resp. Opp'n Defs.' Second Mot. Summ. J. 13.  However, Defendants do address the provisions in combination in their briefing and thus have not waived the issue.  *See* Defs.' Second Mot. Summ. J. 27–28.

requirement, 10 ILCS 5/10-3, Illinois's election law provides that "no petition sheet shall be circulated more than 90 days preceding the last day . . . for the filing of such petition, 10 ILCS 5/10-4. In Count IV, Plaintiffs allege that these requirements, plus the "splitting of population centers" in the 13th Congressional District, cumulatively "constitute a regimen or scheme imposed on . . . Plaintiffs by the Defendants to unconstitutionally limit ballot access to only two established political parties." Compl. 19.

The 13th Congressional District comprises over 5,793 square miles. Defs.' Second Mot. Summ. J. 9–10; Pls.' Resp. Statement Material Facts 19–20. It includes the entire cities of Champaign, Urbana, and Decatur and substantial portions of Springfield, Bloomington, Normal, Edwardsville, Glen Carbon, and Collinsville. Defs.' Second Mot. Summ. J. 9–10; Pls.' Resp. Statement Material Facts 19–20. As of 2020, it had a population density of 123.0 persons per square mile. Defs.' Second Mot. Summ. J. 9; Pls.' Resp. Statement Material Facts 19.

Plaintiffs argue that "[t]he undisputed facts demonstrate that Gill was more diligent in his effort to qualify for Illinois's ballot than 99.9 percent of all congressional candidates in American history" and "[t]hat he nonetheless fell short is, by itself, powerful evidence that the challenged provisions are unconstitutionally burdensome." Pls.' Second Mot. Summ. J. 10. They add that "the record is also replete with facts demonstrating that the challenged provisions are severely burdensome by every other relevant metric." *Id*. at 10–11.

As discussed above, the Court does not find that the five percent requirement, here requiring 10,754 signatures, is severely burdensome. *See supra* Section II(b). While collecting that number of signatures in 90 days is more challenging than collecting them in an unlimited amount of time, the Court does not find that it is so onerous as to pose a severe burden on Plaintiffs' rights. Even assuming Gill needed to collect 15,000 signatures to allow him a cushion

20

in case of objections, *see* Winger Dep. 50:9–11 (recommending that candidates collect "at least 50 percent more raw signatures than the legal requirement"), if he engaged five more petition circulators who collected an average of eight signatures per day, he would reach that amount. *See* Gill Suppl. Aff. ¶¶ 3, 4 (noting that Gill and his eighteen petition circulators collected approximately 11,350 signatures). Gill himself averaged approximately fifty-six signatures per day. *See id.* ¶ 3. This does not seem unreasonable to the Court. *See Stone*, 750 F.3d at 684 ("Ninety days does not strike [the court] as an excessively short time to gather 12,500 signatures."); *see also Jenness*, 403 U.S. at 433 (addressing a requirement that a candidate collect signatures totaling five percent of registered voters in 180 days).

Moreover, while collecting signatures in a larger and more sparsely populated district such as the 13th Congressional District[15] may require travelling greater distances than in a smaller and denser district, the latter poses its own challenges, such as heavy traffic. It is difficult to pronounce for certain which is the more difficult task. And while much of the 13th District is rural, several large cities also are present, either fully or partially, within its boundaries. Plaintiffs assert that "[t]he division of cities and counties created confusion, errors, and impediments to collecting signatures and substantial loss of signature gathering opportunities at public events," Pls.' Second Mot. Summ. J. 5, but petition circulators could remedy much of the confusion by using clearly marked maps to ascertain whether an address is in-bounds. Arguably, keeping track of district boundaries would be *more* onerous in small, densely populated districts such as those in Chicago, where boundaries would be much closer together.

---

[15] The 13th Congressional District of Illinois is far from the largest, most rural district in the country. The entire state of Montana, for example, is a single congressional district, but one candidate, Steve Kelly, still managed to collect 10,186 signatures in 1994. *See* Winger Dep. 37:19–38:3.

Finally, the Court does not find that the notarization requirement pushes the cumulative burden over the edge.  As discussed above, *see supra* Section II(a), Illinois's limitations on who can become a notary are not severe, and the Court finds the requirement that every page be notarized to be reasonable.  Petition circulators in the 13th Congressional District could get an entire stack of petition pages notarized at the same time or could even become notaries themselves, which would make the additional burden minimal.

Plaintiffs' main argument in support of their contention that the combined provisions impose a severe burden is that "the challenged provisions have completely excluded independent congressional candidates from Illinois's ballot since 1974."  Pls.' Second Mot Sum. J. 12[16]; *see Storer*, 415 U.S. at 742 ("Past experience will be a helpful, if not always an unerring, guide . . . .").  In support, Plaintiffs point to evidence provided by Winger, their expert.  *See* Pls.' Statement Undisputed Material Facts 7–10.  However, Plaintiffs ignore that independent candidates may appear on the ballot, even if they have not submitted the required number of signatures, if no one objects to their nominating petitions.  *See* Winger Dep. 24:25–25:2 ("Illinois is the only state that will allow a petitioning candidate to get on the ballot even though he or she has not met the legal requirement.").[17]  Winger only states that no candidate other than H. Douglas Lassiter in 1974

---

[16] Plaintiffs note that they do not include in this analysis candidates during elections following a reapportionment, when only 5,000 signatures are required to appear on the ballot.  Pls.' Second Mot. Summ. J. 12. In 2012, which followed a reapportionment, independent candidate John Hartman collected more than 5,000 signatures and appeared on the ballot for the 13th Congressional District.  Menzel Aff. ¶¶ 9–11, Defs.' Second Mot. Summ. J. Ex. 7, ECF No. 58-7.  And that same year, Paula Bradshaw appeared on the ballot as a Green Party candidate for the 12th Congressional District after submitting 571 notarized sheets containing up to 10 signatures per sheet.  Winger Dep. 33:6–34:8.

[17] In 2018, the ISBE created a new policy that even where no objection was filed to nominating petitions, petitions with fewer than ten percent of the legal requirement would be invalidated.  State of Illinois Candidate's Guide Preface, Pls.' Second Mot. Summ. J. Ex. 8, ECF No. 62-9 ("Effective with the 2018 primary election and continuing thereafter, the [ISBE] will implement a limited 'apparent conformity' review of all nominating petitions filed with it" which "will be limited to determining the following: (1) whether a signed Statement of Candidacy has been filed, and (2) whether the filed nominating sheets contain gross signatures equal to or exceeding 10% of the minimum number of signatures required for the office sought.").  This does not change the Court's analysis.  If that requirement had been present in 2016, an unobjected-to candidate would have needed to present 1,075 signatures, which, as discussed above, would have been easily satisfied by Gill and other candidates, for example, Bill

"has ever *overcome* a general election signature requirement of 8,593 or more in Illinois" and clarifies that his use of "overcome" indicates candidates whose nominating petitions were objected to. Winger Aff. ¶¶ 10, 12, Pls.' Second Mot. Summ. J. Ex. 4, ECF No. 62-5 (emphasis added). He testified in his deposition that he "d[id not] know" if there had "been candidates who did not overcome an objection who nevertheless submitted signatures in excess of 8,593." Winger Dep. 28:21–24. Further, he testified that "there [were] quite a few" independent or new party candidates "in recent years running for Congress who did get on the ballot," although he did not know how many signatures each collected. *Id*. at 29:16–30:22. He pointed to one candidate, Bill Scheurer, who appeared on the ballot in 2006 after submitting over 5,000 signatures (his petition was not objected to). *Id*. at 31:1–32:9.

From these undisputed facts, it is clear that, while there may not have been a candidate who overcame an objection that presented more than 8,593 valid signatures since Lassiter, there have been several independent or new party candidates for the House of Representatives in Illinois appearing on the ballot in the meantime. This undermines Plaintiffs' argument that Illinois's ballot restrictions have had a "stifling effect . . . on independent candidates for Congress." *See* Pls.' Second Mot. Summ. J. 11. While the Court believes a reasonably diligent candidate in the 13th Congressional District could collect 10,754 valid signatures, even if some candidates could not, that Illinois allows unobjected-to independent candidates to appear on the ballot—and that several have—makes it clear that Illinois's election laws "in no way freeze[] the status quo, but implicitly recognize[] the potential fluidity of American political life." *See Jenness*, 403 U.S. at 439.

---

Scheurer, who appeared on the 2006 ballot after no objection was filed to his nominating petitions, which contained 5,000 signatures, *see* Winger Dep. 31:1–32:9.

Moreover, Plaintiffs do not provide evidence that any candidate other than Gill attempted to collect the required number of signatures but was subsequently excluded from the ballot. Evidence that many candidates had tried and failed to access the ballot was important for the court in *Graveline v. Benson*, 992 F.3d 524 (6th Cir. 2021), in which the Sixth Circuit found that Michigan's cumulative ballot restrictions were unconstitutional in part because of the extensive evidence that candidates had actually attempted to satisfy the requirement but had fallen short. *Id*. at 539–40.  Plaintiffs have failed to satisfy their burden of showing that the cumulative barriers to ballot entry in Illinois are severely burdensome.

Thus, Illinois need only have a legitimate interest in its regulations, which, as discussed extensively above, *see supra* Sections II(a), (b), it does.  *See also Stone*, 750 F.3d at 685 (finding that "[t]here [wa]s no question that" the relevant signature requirement "and accompanying rules," which included a 90-day limitation on collecting signatures, "serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections" (quotation marks omitted)).

Gill undoubtedly worked hard to collect signatures, managing to collect nearly 11,350. Unfortunately for him, enough of these were deemed invalid that he fell below the amount required to withstand an objection to his nominating papers.  But simply because Gill was unable to get on the ballot does not mean that no reasonably diligent candidate could, and his failure to do so does not invalidate Illinois's regulations.  The Court finds that Illinois's election provisions, cumulatively and in combination with the geographical features of the 13th Congressional District, do not violate the First and Fourteenth Amendments.  Defendants' motion for summary judgment as to Count IV is granted, and Plaintiff's motion for summary judgment is denied.

24

## CONCLUSION

For the foregoing reasons, Defendants Charles W. Scholz, Ian K. Linnabary, William J. Cadigan, Laura K. Donahue, William R. Haine, William M. McGuffage, Katherine S. O'Brien, and Cassandra B. Watson's renewed motion for summary judgment, ECF No. 58, is GRANTED, and Plaintiffs David M. Gill, Dawn Mozingo, Debra Kunkel, Linda R. Green, Don Necessary, and Greg Parsons's renewed motion for summary judgment, ECF No. 62, is DENIED.  The Clerk is directed to enter judgment and close the case.

Entered this 31st day of March, 2022.

s/ Sara Darrow

SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE